Maria Marcella Rodriguez
**MUNOZ, Petitioner,**

v.

**Michael Terrazas RAMIREZ,**
**Respondent.**

No. MO–12–CV–00082–DC.

United States District Court,
W.D. Texas,
Midland/Odessa Division.

Jan. 25, 2013.

932

Laura D. Dale, Laura Dale & Associates, P.C., Houston, TX, for Petitioner.

Aubrey Jan Fouts, Tha Fouts Law Firm, Roderique S. Hobson, Lubbock, TX, Robert R. Truitt, Jr., Robert R. Truitt, P.C., Midland, TX, for Respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID COUNTS, United States Magistrate Judge.

BEFORE THE COURT is Petitioner Maria Marcella Rodriguez Munoz' Verified Petition for Return of Child. (Doc. 1). This case was referred to the Magistrate Judge for the Midland/Odessa Division on August 2, 2012, by Order of Referral from the United States District Judge pursuant to 28 U.S.C. § 636 and Appendix C of the Local Rules. (Doc. 6). On October 26, 2012, Petitioner Munoz consented to the undersigned U.S. Magistrate Judge for final disposition of this case on the merits. (Doc. # 15). Thereafter, on November 1, 2012, Respondent Michael Terrazas Ramirez consented to the undersigned U.S. Magistrate Judge for final disposition. (Doc. 16). Subsequently, the United States District Judge issued an Order on November 7, 2012, granting consent and reassigning this case to the undersigned. (Doc. 17).

On December 19, 2012, the Court held a bench trial and heard testimony from Petitioner Munoz, Leticia Torres Garcia, Respondent Ramirez, and Carmen Ramirez. Following the bench trial, the parties submitted post-trial supplemental briefing on or before December 28, 2012, pursuant to the Court's pre-trial Scheduling Order.

(Docs. 62, 63, & 64). After due consideration and upon review of the complaint, testimony, exhibits, briefing, and all arguments made, the Court now enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[1]

## I. FINDINGS OF FACT

1. Petitioner Munoz is a citizen of the Republic of Mexico.

2. Respondent Ramirez is a citizen of the United States of America.

3. Petitioner and Respondent are the parents of A.R.R. The child was born in Chihuahua, Chihuahua, Mexico, in April, 2007. She is currently five years old and is eligible for return to Mexico under the Hague Convention on the Civil Aspects of International Child Abduction.

4. Petitioner and Respondent are not married and have never been married to each other, nor have they ever cohabited as spouses.

5. Respondent, although the father, was not listed as the father on A.R.R.'s original United Mexican States State of Chihuahua Civil Registry Birth Certificate. The original birth certificate does not list any male as the father of A.R.R.

6. On March 18, 2008, the parties officially added Respondent as the father of A.R.R. on the child's State of Chihuahua Civil Registry Birth Certificate.

7. On March 19, 2008, the parties obtained a Consular Report of Birth Abroad of a Citizen of the United States from the U.S. Consulate in Ciudad Juarez, Mexico. A.R.R. is a dual citizen of the Republic of Mexico and the United States of America.

8. From birth until on or about a date between June 2011 and August 2, 2011,[2] A.R.R. continuously lived with Petitioner in Chihuahua, Chihuahua, Mexico, with periodic trips to see her father and extended family in the United States. Before A.R.R.'s birth Petitioner moved to Chihuahua, Chihuahua, Mexico, from San Luis Potosi, Mexico, with her three children from a previous marriage: C.D. (age 15), L.G. (age 13), and M.J. (age 12). Petitioner has continuously lived in Chihuahua, Chihuahua, Mexico, with all of her children since 2006.[3]

9. Petitioner and Respondent do not have a formal custody or visitation agreement. The parties had a verbal agreement as to visitation. The arrangement was that Petitioner would always let Respondent take A.R.R. for visitation if Respondent promised to bring A.R.R. back. Petitioner freely allowed Respondent or Respondent's family members to take A.R.R. from Chihuahua, Chihuahua, Mexico, for visitation in the United States. Except for the last visit, at the conclusion of each visitation A.R.R. was returned to Petitioner's home in Chihuahua, Chihuahua, Mexico, by Respondent or a member of Respondent's family. Approximately six visits occurred between March 2008, and either a date in June 2011 or August 2, 2011,[4] in which A.R.R. visited Respondent and his family primarily in Lenorah, Texas.[5] The respec-

---

1. To the extent that any finding of fact is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such.

2. The exact date of transfer of possession of A.R.R from Petitioner to Respondent is disputed by the parties.

3. Petitioner asserts that Respondent requested that Petitioner move from San Luis Potosi, Mexico, to Chihuahua, Chihuahua, Mexico, in order to be closer to him while they were dating.

4. The parties dispute the date of the last visit before retention in the United States.

5. While visiting Respondent, he took A.R.R. on trips outside of Lenorah, Texas, to loca-

tive lengths of the various visits are disputed by the parties.[6]

10. Respondent and his family regularly made trips to see A.R.R. in Chihuahua, Chihuahua, Mexico.

11. Respondent, from the time of Petitioner's pregnancy until A.R.R's last visit, consistently provided financial support to Petitioner for A.R.R. in amounts ranging from $3,000.00 to $6,000.00 Mexican pesos.

12. In early or mid-June of 2011,[7] Respondent and Laura Ramirez (Respondent's sister) picked up A.R.R. from her home in Chihuahua, Chihuahua, Mexico, for a verbally-agreed period of visitation in the United States. The parties further agreed that A.R.R. would travel with Respondent or Respondent's family from Lenorah, Texas, to San Luis Potosi, Mexico, for Laura Ramirez' *quinceanera* scheduled on or about June 25, 2011. The parties also agreed that Petitioner and her children, C.D. (age 15), L.G. (age 13), and M.J. (age 12), would travel from Chihuahua, Chihuahua, Mexico, to San Luis Potosi, Mexico, to attend the *quinceanera*.

13. On or about June 13, 2011, Respondent's father, Jessie Ramirez, and Respondent's step-mother, Carmen Ramirez, who is also Petitioner's sister, took A.R.R. from Lenorah, Texas, to San Luis Potosi, Mexico, to attend the *quinceanera*.

14. On or about June 24, 2011, Petitioner and her children arrived in San Luis Potosi, Mexico, by bus from Chihuahua, Chihuahua, Mexico, to attend the *quinceanera*. Respondent purchased the bus tickets and Petitioner and her children stayed at a vacation home owned by Respondent's family.

15. On June 23, 2011, Respondent took a flight from Midland, Texas, to San Luis Potosi, Mexico. Respondent's return flight was scheduled for June 27, 2011, from San Luis Potosi, Mexico, to Midland, Texas.

16. On or about June 25, 2011, Petitioner, Respondent, A.R.R., and Petitioner's other children, all attended Laura Ramirez' *quinceanera*.

17. Petitioner asserts that after the *quinceanera*, on or about July 1, 2011, she took all of her children, including A.R.R., from San Luis Potosi, Mexico, by bus back to her home in Chihuahua, Chihuahua, Mexico. Petitioner asserts that A.R.R. spent the entire month of July 2011 with her, and in her possession, in Chihuahua, Chihuahua, Mexico.[8] In contrast, Respondent asserts that upon conclusion of the *quinceanera* A.R.R. went directly back to the United States from San Luis Potosi, Mexico, with Respondent's parents.[9] Respondent asserts that A.R.R. has lived with Respondent in Lenorah, Texas, since his

tions such as Midland, Texas, Disney World, Schlitterbahn, Six Flags, and Dallas Cowboys Stadium.

**6.** Petitioner asserts that each visit lasted approximately two to three weeks. Respondent asserts that visitation varied from two to four to six weeks. Respondent also asserts that the longest period of visitation occurred in 2010 and lasted between three and four months.

**7.** The parties dispute the exact date in June on which A.R.R. was picked up from Petitioner's home in Chihuahua, Chihuahua, Mexico, for visitation in the United States. Respondent asserts that he picked up A.R.R. on or about June 5, 2011. Petitioner asserts that Respondent picked up A.R.R. on or about

June 16, 2011. The dates for transfer of possession of A.R.R from Petitioner to Respondent, and the dates and length of actual possession by Respondent of A.R.R. in the United States are disputed by the parties in this case.

**8.** Leticia Torres, Petitioner's next door neighbor in Chihuahua, Chihuahua, Mexico, testified that A.R.R. was living with Petitioner during the month of July 2011. Ms. Torres further testified that she last recalled seeing A.R.R. in late July 2011.

**9.** Carmen Ramirez testified that when she left the *quinceanera*, she returned to Lenorah, Texas, with her husband Jessie Ramirez, her daughter Laura Ramirez, and A.R.R.

parents brought A.R.R. back to Lenorah, Texas, following the *quinceanera*. Respondent asserts that A.R.R. was with Respondent, and in Respondent's possession, for both July and August 2011. Respondent further asserts that the parties agreed that A.R.R. would be educated in the United States and begin school in September of 2011. Petitioner asserts that the parties agreed that A.R.R. would be educated in Chihuahua, Chihuahua, Mexico, and that she never gave permission for A.R.R. to begin school in the United States.

18. Previously, on February 15, 2011, Petitioner registered A.R.R. for kindergarten in Chihuahua, Chihuahua, Mexico, for the 2011–2012 school year. Petitioner claims it was her intent that A.R.R. start school in Chihuahua, Chihuahua, Mexico, on August 22, 2011.

19. Petitioner asserts that Respondent contacted Petitioner in late July 2011, after A.R.R. had returned to Chihuahua, Chihuahua, Mexico, from the *quinceanera*, seeking to take A.R.R. on another vacation to the United States. Petitioner asserts that she gave Respondent permission to take A.R.R. for an additional visit, a last summer vacation, as long as A.R.R. was returned to Chihuahua, Chihuahua, Mexico, by August 22, 2011, in time for A.R.R. to start school. Petitioner further asserts that on or about August 2, 2011, Jessie and Carmen Ramirez picked up A.R.R. from Petitioner's home in Chihuahua, Chihuahua, Mexico. In contrast, Respondent denies that Jessie and Carmen Ramirez traveled to Chihuahua, Chihuahua, Mexico, to pick up A.R.R. on or about August 2, 2011.[10]

20. Respondent is CEO of a trucking and construction company. Bank records from his corporate account produced at approximately noon on December 17, 2012, the day before trial, in response to Petitioner's previous request for production, shows a charge for a border crossing on August 3, 2011, indicating that someone using the corporate account crossed the international border checkpoint at Ojinaga, Chihuahua, Mexico, and entered the United States via Presidio, Texas. Respondent asserts that Jessie Carmen Ramirez traveled to Ojinaga, Chihuahua, Mexico, in early August 2011, to see relatives, but did not go all the way to Chihuahua, Chihuahua, Mexico, to bring A.R.R. back to the United States for visitation.

21. Petitioner asserts that on or about August 18, 2011, Petitioner contacted Respondent by telephone to confirm that Respondent or his family members were returning A.R.R. before August 22, 2011. Petitioner asserts that Respondent informed Petitioner that A.R.R. had been in an accident; that he had to take her to the hospital; that she was too sick to travel; and that Respondent needed A.R.R.'s vaccination records. In contrast, Respondent asserts that on August 18, 2011, he spoke with Petitioner seeking A.R.R.'s vaccination records in order to register her for school in Texas.

22. Petitioner refused to send A.R.R.'s vaccination records to Respondent.

23. On or about August 21, 2011, Respondent spoke with Petitioner by telephone and informed Petitioner that he (Respondent) was not going to return A.R.R. to Mexico.[11] Petitioner asserts that Respon-

---

**10.** Carmen Ramirez testified that she did not travel to Chihuahua, Chihuahua, Mexico, in early August to pick up A.R.R. for an additional visit to the United States. She testified that in early August she and Jessie Ramirez crossed the international border in Presidio, Texas, and made a trip to Ojinaga, Chihuahua, Mexico.

**11.** In Respondent's Response to Request for Admission number 10, Respondent admits that on or about August 18, 2011, Respondent

dent communicated that he was legally forbidden to cross the border and return A.R.R. to Mexico without papers, and that if he tried to do so, he would be jailed. Respondent told Petitioner he would bring A.R.R. back in December to visit.

24. On or about August 23, 2011, Respondent took A.R.R. for a Head Start Physical to attend school in Texas.

25. Thereafter, on or about August 24, 2011, Respondent enrolled A.R.R. in school in Texas.

26. After Respondent communicated on or about August 21, 2011, that he was not returning A.R.R. to Mexico, Petitioner sought legal assistance from the Human Rights Center for Women, Inc., in Chihuahua, Chihuahua, Mexico.

27. On August 27, 2011, Petitioner filed a Request for Legal Assistance in the United States.

28. On August 31, 2011, Petitioner filed her Application for Return of Child under the Hague Convention on the Civil Aspects of International Child Abduction with the Mexican Central Authorities.

29. Respondent received a letter from the United States Department of State dated December 19, 2011, informing Respondent that Petitioner sought the return of A.R.R. under the Hague Convention. The letter from the United States Department of State sought the voluntary return of A.R.R. to Petitioner in Chihuahua, Chihuahua, Mexico. Respondent did not make a voluntary return. Respondent was fully aware that Petitioner objected to Respondent's failure to return A.R.R. to Chihuahua, Chihuahua, Mexico.

30. Petitioner filed suit in the Western District of Texas, Midland/Odessa Division, for Return of Child on July 19, 2012.

31. A.R.R. is currently located in Lenorah, Texas, in Martin County, a city within the jurisdiction of the Western District of Texas, Midland/Odessa Division. *See* 28 U.S.C. § 124(d)(7).

32. There was no objection to Petitioner's motion for judicial notice. Thus, the Court took judicial notice over the relevant foreign law as permitted by Article 14 of the Convention. Additionally, there was no objection to allowing David Lopez to testify by affidavit as an expert on Petitioner's custody rights under Mexican law.

33. The Republic of Mexico was the country of habitual residence for A.R.R. prior to her wrongful retention on or about August 21, 2011.

34. In accordance with Article 3 of the Convention and the International Child Custody Abduction Remedies Act, Petitioner proved by a preponderance of the evidence that A.R.R. was wrongfully retained from her country of habitual residence. Petitioner had rights of custody under the laws of the Republic of Mexico, the State in which the child was an habitual resident immediately before retention and was exercising those rights before retention. Respondent's retention of A.R.R. breached Petitioner's rights of custody.

35. Respondent failed to prove that A.R.R.'s habitual residence changed from the Republic of Mexico to the United States prior to her being wrongfully retained in the United States on or about August 21, 2011. Petitioner and Respondent did not have a shared intent to change A.R.R.'s habitual residence from the Republic of Mexico to the United States.

36. In accordance with Article 13 of the Convention and the International Child

---

told Petitioner that he would not return A.R.R. to Mexico. In Request for Admission number 14, Respondent admitted that on or about August 21, 2011, Respondent told Petitioner that he would not return A.R.R to Mexico. (Doc. 41–4 at 2; Ex. P–30).

Custody Abduction Remedies Act, Respondent failed to establish by clear and convincing evidence that there is a grave risk that return of A.R.R. would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. Respondent argues that the following provides evidence that return would expose the child to physical or psychological harm or place the child in an intolerable situation: (1) the living environment in Chihuahua, Chihuahua, Mexico; (2) Petitioner's fear of break-ins of her home evidenced by her testimony that she has bars on her doors and windows; (3) Petitioner's extreme economic hardship when compared to Respondent's relative economic affluence; (4) Petitioner's severe financial stress evidenced by her bank records suggesting that Petitioner could not provide basic needs for A.R.R. or Petitioner's three other children; (5) Petitioner's inability to attend a pretrial hearing because she could not afford the cost of a Visa to travel to the United States; (6) a request for financial assistance made on the day before trial by the caretaker watching over Petitioner's other three children in Chihuahua, Chihuahua, Mexico, while Petitioner was in the United States attending these legal proceedings, seeking funds from Carmen Ramirez to purchase food for Petitioner's children; (7) alleged sexual abuse of Petitioner's other child, M.J. (age 12), by Petitioner's boyfriend Maximino Munoz, who lives with Petitioner and her children in their home in Chihuahua, Chihuahua, Mexico.[12]

37. In accordance with Article 13 of the Convention and the International Child Custody Abduction Remedies Act, Respondent failed to establish by a preponderance of the evidence that Petitioner consented to removal or subsequently consented or later acquiesced to A.R.R.'s retention.

38. In accordance with Article 12 of the Convention and the International Child Custody Abduction Remedies Act, Respondent failed to establish that the "well settled into new environment" affirmative defense was available to Respondent. Petitioner's suit for Return of Child was filed on July 19, 2012, within one-year of A.R.R.'s wrongful retention on or about August 21, 2011.

## II. Analysis

### A. The Hague Convention and the International Child Abduction Remedies Act

Petitioner's case arises pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (hereinafter "the Convention"), Oct. 24, 1980, T.I.A.S.

12. At some disputed point, M.J. (age 12), spoke to Respondent and alleged that Petitioner's boyfriend, Maximino Munoz, touched her in an inappropriate sexual manner. Maximino Munoz is Petitioner's boyfriend and has lived with Petitioner and her four children for approximately two years. Previously, Petitioner's child M.J. (age 12) was sexually abused by Petitioner's brother. Petitioner pressed charges against her brother, took M.J. to a psychologist, therapist, a caseworker at school, and attended group therapy. Her brother fled Chihuahua, Chihuahua, Mexico, and has never been prosecuted. Soon after hearing M.J.'s (age 12) allegation against Maximino Munoz, Respondent confronted Petitioner and had M.J. (age 12) tell her mother the allegations. Respondent asked that Maximino Munoz be removed from the home and that M.J. get therapy. After returning to Chihuahua, Chihuahua, Mexico, from the *quinceanera*, in San Luis Potosi, Mexico, Petitioner made Maximino Munoz move out in late August 2011. Petitioner entered M.J. (age 12) and the entire family into group therapy for approximately three to four months. Petitioner testified that Maximino Munoz was cleared of the allegations during therapy. Petitioner allowed Maximino Munoz to move back into her home in December 2011. There are no allegations that Maximino Munoz ever inappropriately touched A.R.R., the subject of the Petition for Return.

No. 11670, S. Treaty Doc. No. 99–11. The Convention's purpose is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Convention, art. 1. The United States is a Contracting State and Congress implemented its provisions through the International Child Abduction Remedies Act (hereinafter "ICARA"), 102 Stat. 437, 42 U.S.C. §§ 11601 *et seq.* ICARA establishes procedures for applying the Convention in the courts of the United States, specifically assigning burdens of proof for proving a case for return of a child and for establishing affirmative defenses to return. *See* 42 U.S.C. § 11603. In addition, Congress made clear the provisions in ICARA "are in addition to and not in lieu of" the Convention. *Id.* at § 11601(b)(2).

■ ICARA unequivocally limits the scope of U.S. courts to decide "rights under the Convention and not the merits of any underlying child custody claims." *Id.* at § 11601(b)(4). The purpose of ICARA is to give courts the tools to implement the Convention's primary goals of "restor[ing] the pre-abduction status quo and . . . deter[ring] parents from crossing borders in search of a more sympathetic court." *England v. England,* 234 F.3d 268, 271 (5th Cir.2000) (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1067 (6th Cir.1996)). "[A]ny debate on the merits of the question, *i.e.* of custody rights, should take place before the competent authorities in the State where the child had its habitual residence prior to its removal [or retention]. . . ." Elisa Pérez–Vera, Explanatory Report ¶ 19, *in* 4 Hague Conference on Private Int'l Law, Acts and Documents of the Fourteenth Session, Child Abduction 426, 430 (1982) (hereinafter the "Elisa Pérez–Vera Explanatory Report").[13]

Procedurally, a petitioner seeking return of a child may file a petition in either federal or state court for a decision made "in accordance with the Convention." 42 U.S.C. § 11603(a), (b), (d). A court's jurisdiction is proper when the alleged wrongfully removed or retained child is physically located within the court's jurisdiction. *Id.* at § 11603(b). "The Convention ceases to apply when the child attains the age of 16 years." Convention, art. 4.

## B. Petitioner Munoz' case

■ "The Convention's central operating feature is the return remedy." *Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010). A petitioner seeking the return of a child under ICARA has the burden of proof to establish by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). A parent wrongfully removes or retains a child under the Convention "when he or she removes or retains the child outside of the child's country of habitual residence" and the removal or retention breaches the cus-

---

**13.** The Elisa Pérez–Vera Report "is recognized by the Conference as the official history and commentary on the Convention." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed.Reg. 10494, 10503 (1986). In *Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1994, 176 L.Ed.2d 789 (2010), doubt was cast as to whether the Elisa Pérez–Vera Report should be given great weight as the official commentary of the Convention or whether it is simply a scholarly secondary source. In any event, the Fifth Circuit has consistently used the Elisa Pérez–Vera Report as an authoritative source on the background and meaning of the provisions in the Convention. *See e.g., Larbie v. Larbie,* 690 F.3d 295, 306–07 & n. 12 (5th Cir.2012); *Sealed Appellant v. Sealed Appellee,* 394 F.3d 338, 343 (5th Cir.2004). This Court shall do the same.

tody rights of the non-removing parent under the laws of that country. *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir.2004); Convention, art. 3(a). Furthermore, the non-removing or non-retaining parent must have been exercising those custody rights at the time of removal. *Sealed Appellant*, 394 F.3d at 343; Convention, art. 3(b).

■ Thus, proving a case of wrongful retention under the Convention consists of three elements that must be established by a preponderance of the evidence. *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir.2012). "First, the petitioner must show that the respondent ... retained the child somewhere other than the child's habitual residence." *Larbie*, 690 F.3d at 307. Second, if petitioner is successful in proving the threshold element, then the "question becomes whether the ... retention violated the petitioner's 'rights of custody' under the habitual-residence nation's laws." *Id.* (citations omitted). And third, if petitioner has rights of custody under the habitual-residence nation's laws, then petitioner need only make a final showing that "at the time of ... retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the ... retention." *Id.* (quoting Convention art. 3(b)).

### i. *Habitual Residence*

■ The threshold question before the Court in this alleged wrongful retention case is whether Mexico was the habitual residence of A.R.R. *Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir.2012) (citing *Mozes v. Mozes*, 239 F.3d 1067, 1072 (9th Cir.2001)); *see also Saldivar v. Rodela*, 879 F.Supp.2d 610, 618–19 (W.D.Tex.2012). The Convention does not define the term "habitual residence." *Mozes*, 239 F.3d at 1071; *see* Convention, arts. 1–45 (providing no definition for habitual residence). Simi-

larly, ICARA does not provide guidance. *See* 42 U.S.C. § 11602. Thus, courts have created various definitions and competing frameworks for deciding a child's country of habitual residence. *E.g., Compare Mozes*, 239 F.3d at 1076–81 *with Robert v. Tesson*, 507 F.3d 981, 989–95 (6th Cir. 2007). Recently, the Fifth Circuit adopted its framework for making country of habitual residence determinations. *Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir.2012). The inquiry balances the interests of the child with the intentions of the parents. *Larbie*, 690 F.3d at 310. A court's "inquiry into a child's habitual residence is not formulaic; rather it is a fact-intensive determination that necessarily varies with the circumstances of each case." *Id.* (quoting *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir.2004)). When determining a child's country of habitual residence, analysis focuses on the "parents' shared intent or settled purpose regarding their child's residence." *Id.* (quoting *Nicolson v. Pappalardo*, 605 F.3d 100, 104 & n. 2 (1st Cir.2010)). The inquiry balances the interest of the child with the parents intentions, but gives greater weight to the parents' subjective intentions when the child is relatively young and incapable of deciding residency. *Id.* (citing *Whiting*, 391 F.3d at 548–49).

■ In the instant case, the facts clearly indicate that both parents shared the intent that Chihuahua, Chihuahua, Mexico, was their child's residence prior to Respondent's taking of A.R.R. with Petitioner's consent, in early to mid-June 2011, to Lenorah, Texas, from Chihuahua, Chihuahua, Mexico. Petitioner establishes that from A.R.R.'s birth in Mexico in April 2007, until a date between June 2011 and August 2, 2011, A.R.R. continuously lived in Petitioner's home in Chihuahua, Chihuahua, Mexico. Although no formal custody agreement exists, the parties adhered to a

verbal visitation arrangement in which A.R.R. was either visited in Mexico by Respondent or taken to the United States for visitation by Respondent or members of his family and then returned back to Mexico. Respondent also provided financial support from the time of Petitioner's pregnancy up until the alleged wrongful retention in amounts ranging from $3,000.00 to $6,000.00 Mexican pesos. Moreover, in answers to interrogatories Respondent concedes that Chihuahua, Chihuahua, Mexico, was A.R.R.'s country of habitual residence until he picked her up at Petitioner's home in June 2011. (Doc. 41–4 at 5–7; Ex. P–31). Respondent asserts, however, that A.R.R.'s habitual residence changed from Chihuahua, Chihuahua, Mexico, to the United States. Respondent asserts that the parties entered into an oral agreement that A.R.R. would begin her education in the United States with periodic trips back to Mexico to visit Petitioner, thus changing A.R.R.'s habitual residence to the United States. Petitioner denies any oral agreement to education in the United States and asserts that A.R.R. was to be returned to Petitioner's possession in Chihuahua, Chihuahua, Mexico, by August 22, 2011, in order for her to start school in Mexico.

The threshold test for determining whether the parties intended for A.R.R. to "'abandon the [habitual residence] left behind'" is whether both parties shared that intention. *Larbie v. Larbie,* 690 F.3d 295, 310–11 (5th Cir.2012) (quoting *Mozes v. Mozes,* 239 F.3d 1067, 1075 (9th Cir.2001) (changes in original). In this case, whether the parties shared an intent to abandon A.R.R.'s habitual residence of Mexico is disputed. "[I]n the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned." *Mozes,* 239 F.3d at 1079. Without shared parental intent the "'prior habitual residence should be deemed supplanted only where the objective facts point unequivocally to this conclusion.'" *Larbie,* 690 F.3d at 311 (quoting *Mozes,* 239 F.3d at 1082); *see also Rovirosa v. Paetau,* No. H–12–1414, 2012 WL 6087481, at *6 (S.D.Tex. Dec. 6, 2012). In cases such as this in which the parties no longer agree where the child's habitual residence is fixed and "the representations of the parties cannot be accepted at face value ... courts must determine from all available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is." *Mozes v. Mozes,* 239 F.3d 1067, 1076 (9th Cir.2001); *see also Van Driessche v. Ohio–Esezeoboh,* 466 F.Supp.2d 828, 841 & n. 19 (S.D.Tex.2006) (adopting the position that courts must consider all available evidence to determine the shared parental intent at the time of removal or retention). Here the Court is presented with two different stories and two conflicting timelines for the events surrounding A.R.R.'s retention in the United States and must evaluate the available evidence to determine whether Petitioner agreed to A.R.R. taking up habitual residence in the United States. *See Mozes,* 239 F.3d at 1076.

### a. Petitioner's version of events & evidence

Petitioner testified that the parties agreed that A.R.R. would attend school in Chihuahua, Chihuahua, Mexico, beginning on or about August 22, 2011. The evidence indicates that it was Petitioner's intent in early 2011 that A.R.R. attend school in Mexico. On February 15, 2011, Petitioner registered A.R.R. for kindergarten in Chihuahua, Chihuahua, Mexico, for the 2011–2012 school year. (Ex. P–11). Petitioner further testified that A.R.R. was in her possession during the month of July 2011 following a *quinceanera* in San Luis

Potosi, Mexico,[14] and that on or about August 2, 2011, Respondent's father, Jessie Ramirez, and Respondent's step-mother, Carmen Ramirez, who is also Petitioner's sister, picked up A.R.R. from Petitioner's home in Chihuahua, Chihuahua, Mexico, for a final summer vacation in the United States, from which A.R.R. was never returned. It is Petitioner's testimony that she agreed to the additional visitation based on a promise that Respondent would return A.R.R. to Chihuahua, Chihuahua, Mexico, on or before August 22, 2011, in order for A.R.R to begin school. Petitioner further testified that on or about August 18, 2011, Petitioner contacted Respondent to confirm the travel arrangements for A.R.R. and find out exactly when A.R.R. would be returned. Petitioner contends that Respondent informed her that A.R.R. was not going to be returned as scheduled; that A.R.R. had been injured and was receiving medical attention and Petitioner needed to send A.R.R.'s vaccination records to Respondent. Petitioner's testimony as to Respondent's refusal to return is partially corroborated by Respondent's Response to Request for Admission number 10, in which Respondent admits that on or about August 18, 2011, Respondent told Petitioner that he would not return A.R.R. to Mexico.[15] (Doc. 41-4 at 2; Ex. P-30). Petitioner did not supply Respondent with A.R.R.'s vaccination records. Petitioner further testified that on

or about August 21, 2011, Respondent informed Petitioner that he would not be returning A.R.R. to Mexico as he faced legal ramifications if he did so, including that he could be jailed, and that additionally, return would negatively impact A.R.R.'s U.S. citizenship. Again, Petitioner's testimony is partially corroborated by Respondent's Response to Request for Admissions. In request number 14, Respondent admitted that on or about August 21, 2011, Respondent told Petitioner he would not return A.R.R to Mexico.[16] (Doc. 41-4 at 3; Ex. P-30). Thereafter, on August 31, 2011, Petitioner filed her Application for Return of Child under the Hague Convention on the Civil Aspects of International Child Abduction with the Mexican Central Authorities.[17] (Doc. 25-4; Ex. P-13).

### b. Respondent's version of events & evidence

Respondent testified that the parties had reached an oral agreement in June 2011, stipulating that A.R.R. would attend school in the United States and would return for a visit in Mexico to see Petitioner in December 2011. Respondent further testified that A.R.R. has consistently been in his or his family's possession starting on or about June 5, 2011, when Respondent picked up A.R.R. from Petitioner's home in Chihuahua, Chihuahua, Mexico, and took A.R.R. to Lenorah, Texas. In contradiction to Petitioner's testimony, Respon-

---

**14.** In support of Petitioner's assertion, Leticia Torres, Petitioner's next door neighbor in Chihuahua, Chihuahua, Mexico, testified that A.R.R. was living with Petitioner during the month of July 2011. Ms. Torres further testified that she last recalled seeing A.R.R. in late July 2011.

**15.** However, in Respondent's Response to Request for admission number 10, he denies that he told Petitioner that A.R.R. was in the hospital. (Doc. 41-4 at 2; Ex. P-30).

**16.** However, in Respondent's Response to Request for admission number 14, he denies that

he told Petitioner that if he returned A.R.R. to Mexico he could go to jail. (Doc. 41-4 at 2; Ex. P-30).

**17.** Petitioner's Hague Application is consistent with Petitioner's testimony as Petitioner alleged in her application that "[a]fter that since last vacation period he take me to have [A.R.R.] in USA, because she could lose shes legal status in USA, and he could be in jail for that, the process would be like 3 months in court." (Doc. 24-4 at 15; Ex. P-13).

dent testified that A.R.R. remained in his or his family's possession during July and August 2011, and that Respondent never made any arrangements for a final summer visitation in August 2011 with a return date on or before August 22, 2011, in order for A.R.R. to start school in Mexico. Further, Respondent testified that Jessie and Carmen Ramirez never traveled to Chihuahua, Chihuahua, Mexico, to pick up A.R.R. on or about August 2, 2011, for a final summer visit in the United States.[18] In contrast to Petitioner, Respondent asserts that upon conclusion of the *quinceanera* A.R.R. went directly back to the United States from San Luis Potosi, Mexico, with Respondent's parents.[19] Respondent asserts that A.R.R. has lived with Respondent in Lenorah, Texas, since his parents brought A.R.R. back to Lenorah, Texas, following the *quinceanera*.

#### c. Habitual residence determination

After an exhaustive review of all available evidence the Court determines that Petitioner never agreed to A.R.R. taking up habitual residence in the United States and never agreed to A.R.R. being enrolled in school in the United States, thus there is no shared parental intent to shift A.R.R.'s habitual residence from Mexico to the United States. *See Mozes*, 239 F.3d at 1076; *see also Van Driessche*, 466 F.Supp.2d at 841 & n. 19 (S.D.Tex.2006). The evidence points toward Respondent's retention and subsequent enrollment of A.R.R. in school in the United States as Respondent's unilateral action. The Court's determination that there was no change in A.R.R.'s habitual residence is based upon the available facts and evidence discussed *supra*, and upon the following specific points:

#### 1. A.R.R.'s school enrollments

Petitioner enrolled A.R.R. in kindergarten in Chihuahua, Chihuahua, Mexico, on February 15, 2011, clearly providing evidence that it was Petitioner's intent that A.R.R. attend school in Mexico during the 2011–2012 school year. (Doc. 35–2; Ex. P–11). In contrast, Respondent enrolled A.R.R. in school in the United States on or about August 24, 2011, after Respondent informed Petitioner on August 18, 2011, and again on August 21, 2011, that he was not returning A.R.R. to Mexico. (Doc. 41–4 at 2–3; Ex. P–30). Additionally, the Court places great emphasis on the fact that Petitioner retained A.R.R.'s vital documents, such as her vaccination and birth records, in Chihuahua, Chihuahua, Mexico, while A.R.R. went with Respondent to the United States in early or mid-June 2011. (Doc. 24 at 11 ¶ 2; Ex's. P–1–6). If it was the parties' shared intent that A.R.R. was to permanently reside in the United States and start school in Texas in the fall of 2011, Petitioner would have supplied the necessary documents for school enrollment when Respondent picked A.R.R. up in June 2011. Further, if the parties had a shared intent Petitioner would have supplied A.R.R.'s vaccination record after Respondent made a request for the records on or about August 18, 2011. Petitioner did not. The aforementioned provides strong evidence that it was Petitioner's intent that A.R.R. was to be returned to

---

18. In support of Respondent's position, Carmen Ramirez testified that she did not travel to Chihuahua, Chihuahua, Mexico, in early August to pick up A.R.R. for an additional visit to the United States. She testified that in early August she and Jessie Ramirez crossed the international border in Presidio, Texas, and made a trip to Ojinaga, Chihuahua, Mexico.

19. In support of Respondent's position, Carmen Ramirez testified that when she left the *quinceanera*, she returned to Lenorah, Texas, with her husband Jessie Ramirez, her daughter Laura Ramirez, and A.R.R.

Chihuahua, Chihuahua, Mexico, to start kindergarten in Mexico.

### 2. Respondent & Carmen Ramirez' testimony is not credible in light of the evidence

The Court finds that Petitioner's assertion that on or about August 2, 2011, Jessie and Carmen Ramirez picked up A.R.R. from Petitioner's home in Chihuahua, Chihuahua, Mexico, for a final summer vacation in the United States, from which A.R.R. was never returned, is the credible version of the facts. Petitioner agreed to the additional visitation based on a promise that Respondent would return A.R.R. to Chihuahua, Chihuahua, Mexico, on or before August 22, 2011, in order for A.R.R to begin school. Respondent and Carmen Ramirez both testified that Jessie and Carmen Ramirez never made a trip to Chihuahua, Chihuahua, Mexico, on or about August 2, 2011, to pick up A.R.R. for an agreed final summer visit in the United States. The evidence, however, indicates otherwise. Bank records from Respondent's corporate account, produced at approximately noon on December 17, 2012, the day before trial, in response to Petitioner's previous request for production, shows a charge for a border crossing on August 3, 2011, indicating that someone using Respondent's corporate account crossed the international border checkpoint at Ojinaga, Chihuahua, Mexico, and entered the United States at Presidio, Texas. (Doc. 51–1 at 13; Ex. P–36). Respondent and Carmen Ramirez testified that Jessie and Carmen Ramirez traveled to Ojinaga, Chihuahua, Mexico, in early August 2011 to see relatives, but did not go all the way to Chihuahua, Chihuahua, Mexico. The Court acknowledges that the bank records are not conclusive evidence

that Jessie and Carmen Ramirez crossed the international border with A.R.R., but the evidence produced a day before the bench trial aligns perfectly with Petitioner's statement of the facts in Petitioner's Pre-trial Brief in Support of Petition for Return of Child Under the Hague Convention, filed on December 12, 2012, and Petitioner's testimony. (Doc. 24 at 5).[20] Therefore, based upon the available evidence, Petitioner did not agree to A.R.R taking up habitual residence in the United States, and expected compliance with the parties' agreement that A.R.R would be returned to Mexico on or before August 22, 2011. See Mozes v. Mozes, 239 F.3d 1067, 1076 (9th Cir.2001). The available evidence indicates that A.R.R.'s translocation from her established habitual residence of Mexico to the United States was "intended to be of a specific, delineated period" to end on or before August 22, 2011. Mozes, 239 F.3d at 1077. Thus, the parties had a shared intent to return A.R.R. to her country of habitual residence and Respondent's unilateral attempt to change A.R.R.'s country of habitual residence from Mexico to the United States must be denied. See Larbie v. Larbie, 690 F.3d 295, 311 (5th Cir.2012). The objective facts clearly point to not supplanting A.R.R.'s prior habitual residence—the Republic of Mexico. Larbie, 690 F.3d at 311 (citing Mozes, 239 F.3d at 1082).

Based on the aforementioned, Petitioner satisfies the threshold requirement for cases arising under the Convention by establishing that the child's country of habitual residence prior to removal was the Republic of Mexico. See Mozes, 239 F.3d at 1072. Furthermore, Petitioner has proven by a preponderance of the evidence that Respondent retained A.R.R. in the

---

**20.** Petitioner's Pre-trial Brief stated that: "Maria [Petitioner] agreed, and Jessie and Carmen Ramirez came to pick ARR up on August 2, 2011.... Michael [Respondent] agreed to return ARR to Chihuahua by August 18, 2011, so that she could start the following week." (Doc. 24 at 5 ¶ 2).

United States, "somewhere other than the child's habitual residence." *Larbie*, 690 F.3d at 307.

### ii. Rights of Custody

Since Petitioner Munoz successfully proved that Mexico was the child's country of habitual residence, the "question becomes whether the ... retention violated the petitioner's 'rights of custody' under the habitual-residence nation's laws." *Id.; Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir.2004). "The Convention defines 'rights of custody' to 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" *Abbott v. Abbott*, 560 U.S. 1, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010) (quoting Convention, art. 5(a)). Rights of custody arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Convention, art. 3. Further, breach of rights of custody are determined by the law of the State in which the child was a habitual resident immediately before retention. *Id.*

In the matter before the Court, rights of custody will be determined by the application of the laws of the Republic of Mexico.[21] To assist in proving that Petitioner possessed rights of custody under the laws of the Republic of Mexico, Petitioner offered into evidence an affida-vit by attorney David Lopez, an expert on the Mexican legal system, which explains relevant Mexican laws.[22] (Doc's. 44–2 & 45–1; Ex. P–35). When interpreting issues of foreign law, Federal Rule of Civil Procedure 44.1 allows a liberal approach to evidentiary rules, thus making David Lopez' affidavit acceptable proof of Mexican laws. *Saldivar v. Rodela*, 879 F.Supp.2d 610, 621–22 (W.D.Tex.2012) (providing a thorough analysis of the application of foreign law to cases arising under the Hague Convention). Previously the United States District Court for the Western District of Texas, El Paso Division, allowed the use of an affidavit from an attorney expert on Mexican law to assist in determining whether rights of custody existed under the laws of the Republic of Mexico in a case arising under the Convention. *Saldivar*, 879 F.Supp.2d at 621–22. This Court will do the same.

The State of Chihuahua, Mexico, in accordance with the Chihuahua Civil Code adheres to the legal doctrine of *patria potestad*. *See* Chih. Civ. Code, tit. 8, ch. 1, art. 388 *et seq.*; (Doc. 44–2; Ex. P35). "Pursuant to that doctrine both parents have joint custody rights." *Castro v. Martinez*, 872 F.Supp.2d 546, 555 (W.D.Tex.2012) (finding that *patria potestad* satisfied rights of custody in a case arising from a wrongful retention of a child from Chihuahua, Mexico); *Saldivar*, 879 F.Supp.2d at 623–24 (providing a compre-

21. Petitioner requested that judicial notice be taken of Mexican law. (Doc. 23). There was no objection to Petitioner's motion for judicial notice, thus the Court took judicial notice of the relevant foreign law of Mexico and the State of Chihuahua, Mexico, as permitted by Article 14 of the Convention. Judicial notice of foreign law is appropriate in cases arising under the Convention. Convention, art. 14 (providing that "[i]n ascertaining whether there has been a wrongful removal ... the judicial ... authorities of the requested State may take notice directly of the law of, and of

judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.").

22. Petitioner requested by motion that David Lopez by allowed to testify in regard to the relevant Mexican law by affidavit. (Doc. 23). Respondent did not object, therefore the Court allowed David Lopez to testify by affidavit.

hensive discussion on *patria potestad* and the rights attributable to parents under the legal doctrine in cases arising from wrongful retention from Chihuahua, Mexico). Article 389 of the Chihuahua Civil Code details how an unemancipated minor child such as A.R.R. is under *patria potestad* (parental authority) as long as a relative can exercise parental authority over the child in accordance with the law. Chih. Civ. Code, art. 389; (Doc. 44–2 at 5 ¶ 3.5; Ex. P–35). Article 394 explains that even when a person who has *patria potestad* (parental authority) over a child, but does not have possession of that child, that person still has the right to live with that child, unless the parent presents a danger to the child. Chih. Civ. Code, art. 394; (Doc. 44–2 at 5–6 ¶ 3.7; Ex. P–35). Petitioner has been exercising *patria potestad* over A.R.R. since her birth in Chihuahua, Chihuahua, Mexico, in April 2007. *See* Chih. Civ. Code, art. 389. Although Petitioner has not been in physical possession of A.R.R. since on or about August 2, 2011, she still has *patria potestad* (parental authority) under the Chihuahua Civil Code. *See* Chih. Civ. Code, art. 394.

Based on the aforementioned, this Court finds that Petitioner has rights of custody conveyed by *patria potetstad* under the laws of the State of Chihuahua, Mexico.[23] *See Castro v. Martinez*, 872 F.Supp.2d 546, 555 (W.D.Tex.2012); *Saldivar v. Rodela*, 879 F.Supp.2d 610, 623–24 (W.D.Tex.2012). Furthermore, *patria potestad* gave Petitioner specific rights of custody as defined by the Convention. *See Abbott v. Abbott*, 560 U.S. 1, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010); Convention, art. 5(a). Petitioner has proven by a preponderance of the evidence that Respondent retained A.R.R. in breach of Petitioner's rights of custody under the laws of the child's habitual residence—the Republic of Mexico.

### iii. Rights of custody exercised at the time of retention

Petitioner's final hurdle to making a prima facie case for wrongful retention of A.R.R. is showing that at the time of retention she was actually exercising her rights of custody or would have been exercising those rights but for the retention. *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir.2012); Convention art. 3(b). Courts apply a liberal approach when determining whether rights of custody were actually being exercised. *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344–345

23. Additionally, David Lopez, Petitioner's expert witness testifying by affidavit, makes a strong case that Petitioner has greater rights than those attributable to *patria potestad* and actually has guardianship over A.R.R. (Doc. 44–2 at 5–6; Ex. P–35). It is uncontested that A.R.R was born outside of marriage and that Respondent was not listed on A.R.R.'s original United Mexican States State of Chihuahua Civil Registry Birth Certificate. (Doc. 32–1; Ex. P–1.) Respondent officially acknowledged his paternity on March 18, 2008, when he was added to A.R.R.'s State of Chihuahua Civil Registry Birth Certificate. (Doc. 32–2; Ex. P–2). Mr. Lopez asserts that under the Chihuahua Civil Code, when a child is born outside of marriage and the father is acknowledged after the birth, the father only has legal rights from the time of official acknowledgment. (Doc. 44–2 at 5 ¶¶ 3.4 & 3.5; Ex. P–35). Mr. Lopez further asserts that, based upon Article 358 of the Chihuahua Civil Code, when parents not living together acknowledge parentage successively, as in this case, the first person recognized as the parent shall exercise guardianship over the child unless the parties enter into another agreement or a Chihuahuan court orders otherwise. Chih. Civ. Code, art. 358; (Doc. 44–2 at 5 ¶ 3.5; Ex. P–35). Thus, Petitioner might very well have guardianship of A.R.R.; however, the Court stops at its finding that Petitioner's rights of custody under *patria potestad* meets the second prong of the habitual residence determination as a finding of *patria potestad* is sufficient to establish rights of custody under the Convention. *See Castro v. Martinez*, 872 F.Supp.2d 546, 555 (W.D.Tex.2012); *Saldivar v. Rodela*, 879 F.Supp.2d 610, 623–24 (W.D.Tex.2012).

(5th Cir.2004) (citing *Friedrich v. Friedrich,* 78 F.3d 1060, 1065–66 (6th Cir.1996)). This approach avoids deciding merits of a custody dispute, thus, conforming with the objectives of the Convention. *Friedrich,* 78 F.3d at 1065; 42 U.S.C. § 11601(b)(4) (limiting the scope of U.S. Courts to determining "rights under the Convention and not the merits of any underlying child custody claims."). "To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child." *Sealed Appellant,* 394 F.3d at 344–345.

■■■ In the instant case, Respondent made no showing that Petitioner abandoned her child. In contrast, Petitioner clearly established that she was exercising her rights of custody, discussed *supra,* and that she consented to a period of visitation that was to end on or about August 22, 2011, when A.R.R. was to be returned to Petitioner in Chihuahua, Chihuahua, Mexico, in order for A.R.R. to begin school. Respondent never returned A.R.R. pursuant to the verbal agreement. No abandonment of the child occurred and Petitioner would have been exercising her rights of custody but for the wrongful retention; therefore, Petitioner has established all three elements necessary to make a prima facie case for return of A.R.R. to the Republic of Mexico under the Convention. *See Larbie v. Larbie,* 690 F.3d 295, 307 (5th Cir.2012).

### C. Respondent Ramirez' case

"When a child under the age of sixteen has been wrongfully ... retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010) (quoting Convention, art. 12). The Convention sets forth five narrow affirmative defenses to return of a child wrongfully retained from the country of habitual residence. 42 U.S.C. § 11603(e)(2)(A)-(B); Convention, arts. 12, 13, 13(a), 13(b), 20. Two of the defenses must be proven by clear and convincing evidence, 42 U.S.C. § 11603(e)(2)(A): the grave risk of physical or psychological harm defense, Convention, art. 13(b); and, when return would violate the "fundamental principles" relating to the "protection of human rights and fundamental freedoms" of the returning country, Convention, art. 20. The remaining three defenses must be proven by a preponderance of the evidence, 42 U.S.C. § 11603(e)(2)(B): when judicial proceedings were commenced one year after the date of retention and the respondent proves that the child is now settled into the new environment, Convention, art. 12; when the child objects to return and the court finds that the child has reached an age and level of maturity appropriate for the court to take into account the child's view, Convention, art. 13; and, when the petitioner seeking return of the child consented to the initial retention or later acquiesced to the retention, Convention, art. 13(a).

### i. Grave risk of physical or psychological harm

■■■ Respondent Ramirez pleaded and argued at trial the grave risk affirmative defense under the Convention. Respondent asserts that there is a grave risk of physical and psychological harm if A.R.R. is returned to Petitioner; specifically, asserting that return would be to an intolerable situation. Convention, art. 13(b). A respondent who opposes the return of a child and asserts the "grave risk" affirmative defense has the burden of establishing by clear and convincing evidence "that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." 42

U.S.C. § 11603(e)(2)(A); Convention, art. 13(b). Even if a respondent establishes the grave risk exception, "a federal court has 'and should use when appropriate' the discretion to return a child to his or her place of habitual residence 'if return would further the aims of the Convention.'" *England v. England*, 234 F.3d 268, 271–72 (2000) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir.1996)); *see also* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10503–10516, 10509 (March 26, 1986) (hereinafter "Convention Analysis") ("[A] finding that one or more of the exceptions provided by Article[s] 13 and 20 are applicable does not make refusal of a return order mandatory.... [C]ourts retain the discretion to order the child returned even if they consider that one or more of the exceptions applies.").

■■■■ A high threshold exists for establishing the grave risk of harm defense. *See e.g., Silverman v. Silverman*, 338 F.3d 886, 900–01 (8th Cir.2003); *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996). The respondent opposing the child's return must demonstrate "that the risk to the child is grave, not merely serious." Convention Analysis, 51 Fed.Reg. 10503–10516, 10510 (March 26, 1986). A grave risk of harm can be established when return of the child to the country of habitual residence puts the child in "immediate danger prior to resolution" of the underlying custody dispute. *Friedrich*, 78 F.3d at 1069. Examples of such immediate danger include "returning the child to a zone of war, famine, or disease." *Id.; Sanchez v. Sanchez*, No. SA–12–CA–568, 2012 WL 5373461, at *10–11 (W.D.Tex. Oct. 30, 2012).

In support of his "grave risk" affirmative defense, Respondent argues that the narrow exception to return of the child to Mexico applies because of the living environment in Chihuahua, Chihuahua, Mexico,

specifically that: (1) Petitioner's extreme economic hardship when compared to Respondent's relative economic affluence poses a grave risk; and (2) that the alleged sexual abuse of Petitioner's other child, M.J. (age 12), against Petitioner's boyfriend Maximino Munoz, who lives with Petitioner and her children in their home, poses a grave risk.

### a. Extreme economic hardship

■■■ Respondent argues that return of A.R.R. to the child's country of habitual residence, the Republic of Mexico, would pose a grave risk of harm to A.R.R. because of Petitioner's poverty level and extreme economic hardship when compared to Respondent's affluence. Respondent asserts that Petitioner is incapable of providing the basic needs for A.R.R. and Petitioner's three other children: C.D. (age 15), L.G. (age 13), and M.J. (age 12). In support of his position, Respondent directs the Court to Petitioner's bank statements for August and September 2011 to show that Petitioner had no money except for amounts transferred to Petitioner from Respondent or Respondent's family members. (Doc. 27–2; Ex. P–14); (Doc's. 47–7 & 47–8; Ex. R–30–40). At trial, Respondent elicited testimony from Petitioner that she did not attend a pretrial hearing because she could not afford the cost of a Visa to travel to the United States. In further support of his position, Respondent introduced evidence that Carmen Ramirez transmitted $400.00, via Western Union the day before the trial to the caretaker watching over Petitioner's other three children in Chihuahua, Chihuahua, Mexico, because there was no food available in the home and no funds to purchase any food. (Ex. R–63). Respondent highlighted at trial and in post-trial briefing that, "Petitioner testified that she [has] bars on her door and windows, due to her fear of break-ins in her home," suggesting that

Petitioner neighborhood is unsafe and that Petitioner lives in a lower socioeconomic neighborhood. (Doc. 62 at 7, 17).

It is obvious that Respondent, a CEO of a trucking and construction company, is in a far better financial position than Petitioner. Respondent is capable of providing a comfortable lifestyle for A.R.R. in the United States, evidenced by Respondent's testimony revealing that he took A.R.R. on trips to Disney World, Schlitterbahn, Six Flags, and Dallas Cowboys Stadium. However, these points in support of Respondent's argument that return of A.R.R. to the child's country of habitual residence, the Republic of Mexico, would pose a grave risk of harm to A.R.R. because of Petitioner's poverty level and extreme economic hardship fall extremely short of reaching the high threshold necessary to establish the grave risk of harm affirmative defense. *See Friedrich*, 78 F.3d at 1069; 42 U.S.C. § 11603(e)(2)(A); Convention, art. 13(b). Moreover, the Court is secure in finding that poverty and economic hardship are not relevant factors to use when determining whether a court should use its discretionary power in not returning a child to his or her country of habitual residence. The United States Department of State advises the following in regard to the grave risk of harm affirmative defense:

This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interest. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious.

A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

*Friedrich v. Friedrich*, 78 F.3d 1060, 1068–69 (6th Cir.1996) (quoting Convention Analysis, 51 Fed.Reg. 10503–10516, 10510 (March 26, 1986)).

### b. Alleged sexual abuse of Petitioner's other child by Petitioner's boyfriend

 Respondent presents a second argument: that return of A.R.R. to the child's country of habitual residence, the Republic of Mexico, would pose a grave risk of harm to A.R.R. as return would place A.R.R. in an intolerable situation because of an allegation that sexual abuse was committed against Petitioner's child, M.J. (age 12), by Petitioner's boyfriend, Maximino Munoz, who lives with Petitioner and her children in their home in Chihuahua, Chihuahua, Mexico. The grave risk of harm defense may trigger an exception to return of a child to the country of habitual residence "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Friedrich*, 78 F.3d at 1069; *see* Convention, art 13(b). In *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir.2000), the following

standard was used for an Article 13(b) defense based on abuse:

> The text of the article requires only that the harm be "physical or psychological," but context makes it clear that the harm must be a great deal more than minimal. *See Nunez–Escudero v. Tice–Menley,* 58 F.3d 374, 377 (8th Cir.1995). Not any harm will do nor may the level of risk of harm be low. The risk must be "grave," and when determining whether a grave risk of harm exists, courts must be attentive to the purposes of the Convention.

*Walsh,* 221 F.3d at 218 (citations omitted). To restate, the primary function of the return remedy under the Convention is to "not alter the pre-abduction allocation of custody rights ... leav[ing] custodial decisions to the courts of the country of habitual residence." *Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010) (citing Convention, art. 19). U.S. courts are limited to deciding "rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4).

Here the facts reveal that Petitioner's daughter, M.J. (age 12), spoke with Respondent and alleged that Petitioner's boyfriend, Maximino Munoz, touched her in an inappropriate sexual manner. Respondent brought this allegation to the attention of Petitioner and then M.J. (age 12) told Petitioner about the alleged inappropriate touching. Maximino Munoz has lived with Petitioner and her four children for approximately two years. At trial, Petitioner testified that. M.J. (age 12) had been previously molested and raped by Petitioner's brother. Petitioner pressed charges against her brother, took M.J. (age 12) to a psychologist, therapist, a caseworker at school, and attended group therapy. The brother fled Chihuahua, Chihuahua, Mexico, and has never been prosecuted. After hearing the allegations against Maximino Munoz and upon the urging of Respon-

dent, Petitioner made Maximino Munoz move out in late August 2011. Additionally, Petitioner entered M.J. (age 12) and the entire family into group therapy for approximately three to four months. Petitioner testified that Maximino Munoz was cleared of the allegations during therapy and that she allowed Maximino Munoz to move back into her home in December 2011. Both parties agree that there are no allegations that Maximino Munoz ever inappropriately touched A.R.R., the subject of the Petition for Return.

 The allegations against Maximino Munoz are serious concerns and the uncontested fact that he is currently residing in the home where A.R.R. will be living upon return to her country of habitual residence creates a strong platform to argue that A.R.R. should not be returned to an intolerable situation under the grave risk exception. As previously noted:

> An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

*Friedrich v. Friedrich,* 78 F.3d 1060, 1068–69 (6th Cir.1996) (quoting Convention Analysis, 51 Fed.Reg. 10503–10516, 10510 (March 26, 1986)). Respondent, however, does not present any actual evidence that Maximino Munoz has a history of sexually molesting children or that he actually inappropriately touched M.J. (age 12). Respondent testified that he has knowledge that Maximino Munoz was convicted of criminal charges for sexual assault of a minor, but he produced no evidence of any

such conviction that might corroborate his testimony. Petitioner testified that she knew Maximino Munoz served time in prison for a marijuana conviction and was released in 2002. Her testimony indicates that she had information that there were previous legal proceedings against him involving molestation, but she made clear that she had no knowledge of a conviction for any such crime.

In order to establish the "grave risk" affirmative defense, Respondent must show by clear and convincing evidence "that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." 42 U.S.C. § 11603(e)(2)(A); Convention, art. 13(b). Based on the evidence presented, Respondent did not meet the burden of proof to prove that A.R.R. would face a "grave risk" of harm by being placed in an intolerable situation upon return to the Republic of Mexico. *Id.*

 Although the testimony does not paint Petitioner's live-in boyfriend in a pleasant light, Respondent must present evidence of serious neglect or abuse to satisfy the grave risk of harm exception. *See Friedrich v. Friedrich,* 78 F.3d 1060, 1069 (6th Cir.1996); *see also Sanchez v. Sanchez,* No. 12–CA–568, 2012 WL 5373461, at *10–11 (W.D.Tex. Oct. 30, 2012) (evidence of past domestic violence or past drug activity in the home was not enough to reach the grave risk exception). Without a clear showing of abuse or neglect an award of the grave risk of harm exception based on return to an intolerable situation would contradict the Convention's primary goals of "restor[ing] the pre-abduction status quo and ... deter[ring] parents from crossing borders in search of a more sympathetic court." *England v. England,* 234 F.3d 268, 271 (5th Cir.2000) (*quoting Friedrich v. Friedrich,* 78 F.3d 1060, 1067 (6th Cir.1996)). Furthermore,

the grave risk of harm defense was not intended to be used by a respondent as a vehicle to litigate the child's best interests. Convention Analysis, 51 Fed.Reg. 10503–10516, 10510 (March 26, 1986). Without a showing of "grave risk" by clear and convincing evidence, Petitioner's claims are more appropriate for a Mexican court as U.S. courts are limited to deciding "rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4). Any debate regarding whether Respondent is more fit to be the primary caretaker of A.R.R. based on Petitioner's physical living environment, or the claims alleged against Maximino Munoz, must take place in the Republic of Mexico. *See* Elisa Pérez–Vera Explanatory Report ¶ 19 at 430. Therefore, Respondent has failed to establish by clear and convincing evidence that return of the children would pose a grave risk of physical or psychological harm or an intolerable situation under the Convention. *See* 42 U.S.C. § 11603(e)(2)(A); Convention, art. 13(b).

### ii. Consent to retention or later acquiescence to retention

Respondent Ramirez pleaded, and argued at trial, that Petitioner: (1) consented to the removal of A.R.R. from San Luis Potosi, Mexico; (2) consented to the retention of A.R.R. in the United States; or (3) later acquiesced to Respondent's retention of A.R.R. in the United States. Return of a child may be successfully opposed if a respondent establishes by a preponderance of the evidence that the person "exercising the custody rights at the time of removal or retention ... had consented to or subsequently acquiesced in the removal or retention." 42 U.S.C. § 11603(e)(2)(B); Convention, art. 13(a).

 "The consent defense involves the petitioner's conduct prior to the contested removal or retention." *Larbie v.*

*Larbie,* 690 F.3d 295, 308 (5th Cir.2012) (quoting *Baxter v. Baxter,* 423 F.3d 363, 371 (3d Cir.2005); *see also Saldivar v. Rodela,* 879 F.Supp.2d 610, 627–28 (W.D.Tex.2012). When examining a consent defense, a court considers what the petitioner actually agreed to when allowing the child to travel outside of its country of residence and the scope of the petitioner's consent. *Baxter,* 423 F.3d at 371.

 In contrast, the "acquiescence [defense] addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Larbie,* 690 F.3d at 308 (quoting *Baxter,* 423 F.3d at 371) (changes to original); *see also Gonzalez–Caballero v. Mena,* 251 F.3d 789, 794 (9th Cir.2001). When examining an acquiescence defense, " 'each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights.' " *Simcox v. Simcox,* 511 F.3d 594, 603 (6th Cir.2007) (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1069 (6th Cir.1996)). Furthermore, the defense of acquiescence has been held to require "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich,* 78 F.3d at 1070; *see also Velasquez v. Green,* No. 4:12–CV–66, 2012 WL 2885662, at *5 (E.D.Tex. July 13, 2012); *De Vasconcelos v. De Paula Batista,* No. 4:10–CV–00628, 2011 WL 806096, at *7 (E.D.Tex. March 1, 2011).

 Respondent asserts that Petitioner consented to removal by Jessie and Carmen Ramirez from San Luis Potosi, Mexico, to Lenorah, Texas, following a *quinceanera* on or about June 25, 2011. Petitioner asserts that she never consented to the removal and actually took A.R.R. to Chihuahua, Chihuahua, Mexico, following the *quinceanera* in San Luis Potosi, Mexico. The Court's discussion *supra,* finding that A.R.R.'s habitual residence never shifted from the Republic of Mexico to the United States fully addresses the discrepancies between the parties' testimony and found Petitioner's versions of the events to be credible. Based on that discussion, it is clear that Petitioner never consented to removal of A.R.R. to the United States following the *quinceanera* because the evidence directs the Court to the conclusion that A.R.R. traveled with Petitioner to Chihuahua, Chihuahua, Mexico, and not to the United States.

 In addition, Respondent's argument that Petitioner consented or later acquiesced to the retention of A.R.R. in the United States because of an oral agreement that A.R.R. was to start school in the United States fails for the same reasons discussed *supra:* there was no shared agreement and the evidence supports a finding that Petitioner intended A.R.R. to start school in Chihuahua, Chihuahua, Mexico, on August 22, 2011. Moreover, before Petitioner allowed A.R.R. to travel to the United States for a final summer visit with Respondent, Petitioner specifically agreed to a fixed return date of August 22, 2011, in order for A.R.R. to start school in Mexico. *See Mozes v. Mozes,* 239 F.3d 1067, 1077 (9th Cir.2001). Petitioner's conduct prior to A.R.R.'s retention in the United States fully supports a finding that she did not consent to retention. *See Larbie v. Larbie,* 690 F.3d 295, 308 (5th Cir.2012) (citing *Baxter v. Baxter,* 423 F.3d 363, 371 (3d Cir.2005); *see also Saldivar v. Rodela,* 879 F.Supp.2d 610, 627–28 (W.D.Tex.2012).

Respondent's argument that Petitioner later acquiesced to the retention of A.R.R. in the United States also falls short. There is no evidence before the Court that Petitioner ever consented or later acquiesced to A.R.R.'s retention in the Unit-

ed States.[24] On August 31, 2011, approximately ten days following Respondent's wrongful retention, Petitioner filed her Application for Return of Child under the Hague Convention on the Civil Aspects of International Child Abduction with the Mexican Central Authorities. (Doc. 27–1; Ex. P–13). Respondent received a demand from Petitioner to return A.R.R. when he received the letter from the United States Department of State, dated December 19, 2011, informing Respondent that Petitioner sought return of A.R.R. under the Hague Convention. (Doc. 47–10 at 63–65; Ex. R–61). The letter from the United States Department of State sought the voluntary return of A.R.R. to Petitioner in Chihuahua, Chihuahua, Mexico. (Doc. 47–10 at 63–65; Ex. R–61). Respondent did not make a voluntary return. Petitioner's actions reveal a speedy attempt and diligent effort to regain A.R.R and does not lead the Court to believe that Petitioner acquiesced. Respondent was aware that Petitioner objected to his failure to return A.R.R. to Chihuahua, Chihuahua, Mexico, and was fully aware that Petitioner had not consented or acquiesced

to A.R.R.'s retention. Moreover, Respondent has presented no evidence that Petitioner ever made a statement or committed an act with the required formality to acquiesce; ever made a written renunciation of her rights of custody; or that Petitioner ever exhibited a consistent attitude of acquiescence to A.R.R.'s wrongful retention in the United States. *See Friedrich,* 78 F.3d at 1070. Therefore, Petitioner has failed to establish by a preponderance of the evidence that Petitioner "had consented to or subsequently acquiesced in the removal or retention" of A.R.R. *See* 42 U.S.C. § 11603(e)(2)(B); Convention, art. 13(a).

### iii. Well settled into new environment

■ Respondent asserts that the "well settled into new environment" affirmative defense is applicable in this case, thus A.R.R. should not be returned to Mexico. When a petition for return of child is commenced in a court after one year from the date of removal, the respondent can assert an affirmative defense and prevent removal back to the country of habitual residence if respondent proves by a prepon-

---

**24.** Respondent also argued that if this Court found that Petitioner consented or acquiesced to retention, then A.R.R.'s country of habitual residence would have shifted from Mexico to the United States because Petitioner made no clear demand for return until Petitioner filed suit in the Western District of Texas on July 19, 2012. (Doc. 62 at 11–16). Respondent relied on *Karkkainen v. Kovalchuk,* 445 F.3d 280, 291 (3d Cir.2006), for the proposition that "a child is not retained under the Convention until a parent unequivocally communicates his or her desire to regain custody." This argument is moot due to the Court's determination that Petitioner never consented to removal, or consented to or later acquiesced to retention. Additionally, Respondent's argument that A.R.R. has been in the United States for a sufficient time for acclimatization and that from A.R.R.'s perspective has a degree of settled purpose, thus changing the child's habitual residence from Mexico to

the United States, is not a valid legal argument for determining habitual residence in jurisdictions under the 5th Circuit. *See Larbie v. Larbie,* 690 F.3d 295, 309 (5th Cir.2012) (adopting the circuit court's approach for determining a child's country of habitual residence). "The Sixth Circuit takes the ... approach, placing paramount importance on the 'child's experience,' as established by the child's 'acclimatization' and 'degree of settled purpose,' to the exclusion of the parents' 'subjective intent.'" *Larbie,* 690 F.3d at 309. The 5th Circuit recently adopted a different approach that first looks at the parents' shared intent, then includes the child's experience if the child is not so young that "he or she [could] possibly decide the issue of residency." *Id.* (quoting *Whiting v. Krassner,* 391 F.3d 540, 548–49 (3d Cir.2004)). A.R.R is five years old and cannot possibly decide issues of residency.

derance of the evidence that the child is now settled into the new environment. 42 U.S.C. § 11603(e)(2)(B); Convention, art. 12. A.R.R. was retained from her country of habitual residence, the Republic of Mexico, on or about August 21, 2011. Respondent's admission that on or about August 21, 2011, he told Petitioner that he would not return A.R.R. to Mexico provides clear evidence that the date of wrongful retention began on August 21, 2011. (Doc. 41–4 at 3; Ex. P–30). Petitioner filed suit in the Western District of Texas, Midland/Odessa Division, for return of the child on July 16, 2012, within one year from the wrongful retention, thus the well settled into new environment affirmative defense under the Convention is not available in this case.

## D. Attorney Fees and Costs

 Petitioner Munoz has requested attorney fees and costs, including transportation expenses pursuant to Article 26 of the Convention and 42 U.S.C. § 11607(b). Petitioner Munoz has not, to date, submitted proof of costs for transportation, expenses, or legal fees. In a case arising under the Convention, ICARA requires that "[a]ny court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster homes or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 42 U.S.C. § 11607(b)(3). It is the respondent's burden to show that an award of attorney's fees, expenses, and costs would be "clearly inappropriate." *Saldivar v. Rodela,* 879 F.Supp.2d 610, 631–32 (W.D.Tex.2012) (quoting *Whallon v. Lynn,* 356 F.3d 138,

140 (1st Cir.2004); *see also Saldivar v. Rodela,* 894 F.Supp.2d 916 (W.D.Tex.2012).

### CONCLUSIONS OF LAW

The Republic of Mexico was the country of habitual residence for A.R.R. prior to her wrongful retention on or about August 21, 2011.

In accordance with Article 3 of the Convention and the International Child Custody Abduction Remedies Act, Petitioner proved by a preponderance of the evidence that A.R.R. was wrongfully retained from her country of habitual residence. Petitioner had rights of custody under the laws of the Republic of Mexico, the State in which the child was a habitual resident immediately before retention, and Petitioner was exercising those rights before retention. Respondent's retention of A.R.R. breached Petitioner's rights of custody.

Respondent failed to prove that A.R.R.'s habitual residence changed from the Republic of Mexico to the United States prior to her being wrongfully retained in the United States on or about August 21, 2011. Petitioner and Respondent did not have a shared intent to change A.R.R.'s habitual residence from the Republic of Mexico to the United States.

In accordance with Article 13 of the Convention and the International Child Custody Abduction Remedies Act, Respondent failed to establish by clear and convincing evidence that there is a grave risk that return of A.R.R. would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

In accordance with Article 13 of the Convention and the International Child Custody Abduction Remedies Act, Respondent failed to establish by a preponderance of the evidence that Petitioner consented

to removal or subsequently consented or later acquiesced to A.R.R.'s retention.

In accordance with Article 12 of the Convention and the International Child Custody Abduction Remedies Act, Respondent failed to establish that the "well settled into new environment" affirmative defense was applicable in this case.

A primary objective of the Convention is to ensure that rights of custody established in one country are respected by the country where the child has been taken. Convention, art. 1. This Court finds that Petitioner Munoz had rights of custody under the laws of the child's country of habitual residence—the Republic of Mexico. Respondent unilaterally retained A.R.R. in the United States without Petitioner's consent or acquiescence, thus breaching her rights of custody under the laws of the Republic of Mexico. Petitioner was exercising rights of custody before the retention, thus the retention of the child was wrongful and return is the appropriate remedy. The Court further finds that no affirmative defenses were proven to halt the return of the child.

■■■ All parties agree that this is a difficult case. Respondent had rational reasons for retaining his child in the United States; however, this Court is limited to deciding rights under the Convention and not the merits of the underlying child custody claim. *See* 42 U.S.C. § 11601(b)(4). Courts do not apply the best interest of the child standard when determining whether return of children to their country of habitual residence is appropriate. Nothing decided in these proceedings prejudices Respondent Ramirez' ability to file suit in the Republic of Mexico for custody of A.R.R. The Convention and ICARA attempts to "deter parents from crossing borders in search of a more sympathetic court." *England v. England*, 234 F.3d 268, 271 (5th Cir.2000) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067

(6th Cir.1996)). It is the aim of the Convention to "leave custodial decisions to the courts of the country of habitual residence." *Abbott v. Abbott*, 560 U.S. 1, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010); Convention, art. 19. Respondent, if he so chooses, may pursue custody of A.R.R. in the courts of the Republic of Mexico.

## JUDGMENT

Based on the aforementioned, this Court finds that A.R.R.'s habitual residence is the Republic of Mexico and that the child was wrongfully retained in the United States in violation of the Convention. Petitioner Maria Marcella Rodriguez Munoz' Verified Petition for Return of Children is **GRANTED.**

**IT IS HEREBY ORDERED** that A.R.R. shall be immediately returned to the custody of Petitioner Munoz. If Respondent does not return A.R.R. to Petitioner Munoz within five (5) days of this Order, Petitioner is **ORDERED** to file a Motion to Enforce Judgment and Application for Clerk to Issue Writ of Attachment, in which Petitioner shall detail how A.R.R. shall be returned.

**IT IS HEREBY ORDERED** that Respondent Ramirez pay all necessary expenses and attorney fees pursuant to 42 U.S.C. § 11607(b)(3). The award of attorney fees and costs under 42 U.S.C. § 11607(b)(3) is contingent upon Petitioner filing, within fourteen (14) days of this Order, an itemization of all costs requested and a brief detailing the services rendered. FED. R. CIV. P. 54(d)(2)(B)(i). Respondent Munoz shall have seven (7) days from date of service of Petitioner's itemization and brief to file a brief in response, asserting why the requested award is "clearly inappropriate." *See* 42 U.S.C. § 11607(b)(3). Based on the aforementioned, this Court will determine the appropriate monetary award of attorney fees and costs.

IT IS FURTHER ORDERED that the Court retains jurisdiction over this case to permit any modification or enforcement of the Order.

It is so ORDERED.