Maria Julia GALLARDO, Petitioner,

v.

Luis Carlos OROZCO, Respondent.

No. MO–13–CV–00024–DC.

United States District Court,
W.D. Texas,
Midland/Odessa Division.

July 22, 2013.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Jon Mark Hogg, Jackson Walker, L.L.P., San Angelo, TX, for Petitioner.

Robert Victor Garcia, Jr., Attorney at Law, Odessa, TX, for Respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID COUNTS, United States Magistrate Judge.

BEFORE THE COURT is Petitioner Maria Julia Gallardo's First Amended Verified Petition for Return of Child under the Hague Convention. (Doc. 15). This case was referred to the United States Magistrate Judge for the Midland/Odessa Division on March 21, 2013, by Order of Referral from the United States District Judge pursuant to 28 U.S.C. § 636 and Appendix C of the Local Rules. (Doc. 5). On May 13, 2013, Petitioner Gallardo consented to the undersigned U.S. Magistrate Judge for final disposition of this case on the merits. (Doc. 19). Thereafter, on May 15, 2013, Respondent Luis Carlos Orozco consented to the undersigned U.S. Magistrate Judge for final disposition. (Doc. 20). Subsequently, the United States District Judge issued an Order on May 16, 2013, granting consent and reassigning this case to the undersigned. (Doc. 21).

On June 14, 2013, the Court held a bench trial and heard testimony from Petitioner Gallardo via telephone from the Republic of Mexico,[1] and in-person testimony from Respondent Orozco. Additionally, the undersigned met *in camera* with G.G., the child subject to this suit for return. Following the bench trial, the parties submitted post-trial supplemental briefing on June 24, 2013. (Docs. 33 & 34). After due consideration and upon review of the petition, testimony, exhibits, briefing, and all arguments made, the Court now enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[2]

### I. FINDINGS OF FACT

1. Petitioner Gallardo is a citizen of the Republic of Mexico.

2. Respondent Orozco is a citizen of the United States of America.

---

1. Due to Petitioner's criminal conviction for illegal re-entry she was denied a visa to attend the proceedings in person and her testimony was taken by telephone.

2. To the extent that any finding of fact is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such.

3. Petitioner and Respondent are the parents of G.G.

4. The child was born in Denton, Texas, in May of 2005. G.G. is currently 8 years old and is eligible for return to Mexico under the Hague Convention on the Civil Aspects of International Child Abduction.

5. Petitioner and Respondent were married in Las Vegas, New Mexico, on December 18, 2006. The parties remain legally married, although separated.

6. Respondent filed for divorce on May 9, 2013, in the 318th Judicial District in Midland County, Texas. The divorce was filed following Petitioner's suit for Return of Child under the Hague Convention. No orders have been issued from the divorce proceedings initiated in Midland County, Texas. No formal custody agreements exist and no suits are currently pending in the Republic of Mexico.

7. In 2007, Petitioner and Respondent relocated with G.G. from Los Alamos, New Mexico, to Puerto Penasco, Sonora, Mexico.

8. Petitioner and Respondent had a shared intent to move G.G. from the United States to Puerto Penasco, Sonora, Mexico.

9. Since 2007 when the entire family relocated to Puerto Penasco, Sonora, Mexico, from Los Alamos, New Mexico, until on or about July 26, 2012, G.G. continuously lived with Petitioner in Puerto Penasco, Sonora, Mexico.

10. Respondent lived with Petitioner and G.G. in Puerto Penasco, Sonora, Mexico, for approximately two years, until he moved to Midland, Texas.

11. In 2008 Petitioner and Respondent attempted to reunite and relocate to the United States. Petitioner tried to return to the United States illegally and was arrested on December 29, 2008, while attempting to cross the Rio Grande near the port of entry at El Paso, Texas. Respondent was in the United States awaiting Petitioner's crossing. Petitioner served approximately twenty-one (21) days for her illegal re-entry after prior removal stemming from this arrest.

12. Upon release from custody in January 2009, Petitioner was deported to Ciudad Juarez, Chihuahua, Mexico, where Respondent picked her up and returned her to Puerto Penasco, Sonora, Mexico.

13. After Respondent drove Petitioner to Puerto Penasco, Sonora, Mexico, Respondent lived with Petitioner and G.G. for approximately seven months before moving permanently to Midland, Texas.

14. G.G. remained in Puerto Penasco, Sonora, Mexico, with Petitioner.

15. Petitioner and Respondent had a shared intent that G.G. remain with Petitioner in Puerto Penasco, Sonora, Mexico.

16. Thereafter, Respondent's mother, who resides in Puerto Penasco, Sonora, Mexico, would bring G.G. to Midland, Texas, to visit Respondent during the summer while G.G. was on vacation from school. Petitioner consented to these trips. Each visit would last approximately one-to-two months. At the end of each scheduled visit G.G. would be returned to Puerto Penasco, Sonora, Mexico.

17. G.G. has attended school in Puerto Penasco, Sonora, Mexico, since the 2009–2010 school year.

18. G.G. was enrolled in school in Puerto Penasco, Sonora, Mexico, for the 2012–2013 school year.

19. The facts surrounding the alleged wrongful removal or wrongful retention of G.G. are contested, as described in paragraphs 19 and 20 herein. Petitioner asserts that on or about July 25, 2012, Respondent came to Puerto Penasco, Sonora, Mexico, to have a few days of visitation with G.G. at his parents' home in Puerto Penasco. Petitioner asserts that she agreed to allow Respondent to have overnight visitation with G.G. at his parents' home and that Respondent was scheduled to return G.G. after a few days. Petitioner further asserts that instead of returning G.G. to Petitioner as scheduled, Respondent removed G.G. to the United States without her permission.

20. In contrast, Respondent asserts that prior to arriving at Puerto Penasco, Sonora, Mexico, in late July 2012, Respondent arranged with Petitioner to take G.G. to Midland, Texas, for approximately a month to 45 days. It is Respondent's position that Petitioner agreed and consented to the visitation. Respondent asserts that before he took G.G. to Midland, Texas, the parties discussed the possibility of G.G. staying in the United States to attend school. Respondent asserts that Petitioner agreed to think about it, but did not agree at that time to allow G.G. to stay and attend school in Midland, Texas. Respondent further asserts that Petitioner gave Respondent G.G.'s birth certificate. Respondent asserts that he agreed to return G.G. if Petitioner wanted G.G. returned and not enrolled in school in Midland, Texas. Respondent further asserts that after G.G. was in Midland, Texas, the parties continued to have discussions about enrolling G.G. in school.

21. On July 31, 2012, Petitioner sent and Respondent received a text message informing Respondent that G.G.'s school in Puerto Penasco, Sonora, Mexico, started on August 20, 2012, and that G.G. needed to be back by that day.

22. Petitioner requested money for expenses related to G.G.'s enrollment in school in Puerto Penasco, Sonora, Mexico. Respondent sent Petitioner money for the expenses.

23. On August 22, 2012, Petitioner sent and Respondent received a text message demanding that Respondent return G.G. to her in Puerto Penasco, Sonora, Mexico.

24. After Respondent received the text message from Petitioner demanding G.G.'s return, Respondent told Petitioner that he was going to enroll G.G. in school in Midland, Texas.

25. Petitioner objected to Respondent enrolling G.G. in school in Midland, Texas.

26. On or about August 24, 2012, Respondent enrolled G.G. in a school in Midland, Texas.

27. G.G. started school in Midland, Texas, on August 27, 2012.

28. On August 30, 2012, Petitioner filed her Application for Return of Child under the Hague Convention on the Civil Aspects of International

Child Abduction with the Mexican Central Authorities.

29. Petitioner filed suit in the Western District of Texas, Midland/Odessa Division, for Return of Child on March 19, 2013.

30. G.G. is currently located in Midland, Texas, in Midland County, a city within the jurisdiction of the Western District of Texas, Midland/Odessa Division. *See* 28 U.S.C. § 124(d)(7).

31. The Court took judicial notice over the relevant foreign law under the Civil Code for the State of Sonora as permitted by Article 14 of the Convention.

32. The Republic of Mexico was the country of habitual residence for G.G. prior to her wrongful removal on or about July 26, 2012, or her wrongful retention on or about August 20, 2012.

33. In accordance with Article 3 of the Convention and the International Child Abduction Remedies Act, Petitioner proved by a preponderance of the evidence that G.G. was wrongfully removed or wrongfully retained from her country of habitual residence. Petitioner had rights of custody under the laws of the Republic of Mexico, specifically under the laws of Sonora, Mexico, the State in which the child was an habitual resident immediately before removal or retention, and was exercising those rights before removal or retention. Respondent's removal or retention of G.G. breached Petitioner's rights of custody.

34. In accordance with Article 13 of the Convention and the International Child Abduction Remedies Act, Respondent failed to establish by clear and convincing evidence that there is a grave risk that return of G.G. would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. Respondent failed to submit any evidence that would show that return would expose the child to physical or psychological harm or place the child in an intolerable situation. The affirmative defense was alleged in Respondent's Original Answer and the only arguments made at trial in support of the affirmative defense were the following: (1) Petitioner works late hours at a casino; and (2) unsupported allegations that Petitioner works or had worked in the past as a prostitute.

35. In accordance with Article 13 of the Convention and the International Child Abduction Remedies Act, Respondent failed to establish by a preponderance of the evidence that Petitioner consented or subsequently acquiesced to G.G.'s removal or retention.

36. In accordance with Article 13 of the Convention and the International Child Abduction Remedies Act, Respondent failed to establish that G.G. has attained an age and degree of maturity which would make it appropriate for the Court to take into account her views.

## II. Analysis

### A. The Hague Convention and the International Child Abduction Remedies Act

Petitioner's case arises pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (hereinafter "the Convention"), Oct. 24, 1980, T.I.A. S.

No. 11670, S. Treaty Doc, No. 99–11. The Convention's purpose is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Convention, art. 1. The United States is a Contracting State and Congress implemented its provisions through the International Child Abduction Remedies Act (hereinafter "ICARA"), 102 Stat. 437, 42 U.S.C. §§ 11601 *et seq.* ICARA establishes procedures for applying the Convention in the courts of the United States, specifically assigning burdens of proof for proving a case for return of a child and for establishing affirmative defenses to return. *See* 42 U.S.C. § 11603. In addition, Congress made clear the provisions in ICARA "are in addition to and not in lieu of" the Convention. *Id.* at § 11601(b)(2).

■ ICARA unequivocally limits the scope of U.S. courts to decide "rights under the Convention and not the merits of any underlying child custody claims." *Id.* at § 11601(b)(4). The purpose of ICARA is to give courts the tools to implement the Convention's primary goals of "restor[ing] the pre-abduction status quo and ... deter[ring] parents from crossing borders in search of a more sympathetic court." *England v. England,* 234 F.3d 268, 271 (5th Cir.2000) (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1067 (6th Cir.1996)). "[A]ny debate on the merits of the question, *i.e.* of custody rights, should take place before the competent authorities in the State where the child had its habitual residence prior to its removal [or retention].... ." Elisa Pérez–Vera, Explanatory Report ¶ 19, *in* 4 Hague Conference on Private Int'l Law, Acts and Documents of the Fourteenth Session, Child Abduction 426, 430 (1982) (hereinafter the "Elisa Pérez–Vera Explanatory Report").[3]

Procedurally, a petitioner seeking return of a child may file a petition in either federal or state court for a decision made "in accordance with the Convention." 42 U.S.C. § 11603(a, b, d). A court's jurisdiction is proper when the alleged wrongfully removed or retained child is physically located within the court's jurisdiction. *Id.* at § 11603(b). "The Convention ceases to apply when the child attains the age of 16 years." Convention, art. 4.

**B. Petitioner Gallardo's case**

■ "The Convention's central operating feature is the return remedy." *Abbott v. Abbott,* 560 U.S. 1, 9, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010). A petitioner seeking the return of a child under ICARA has the burden of proof to establish by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). A parent wrongfully removes or retains a child under the Convention "when he or she removes or retains the child outside of the child's country of habitual residence" and the removal or retention breaches the cus-

---

3. The Elisa Pérez–Vera Report "is recognized by the Conference as the official history and commentary on the Convention." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed.Reg. 10494, 10503 (1986). In *Abbott v. Abbott,* 560 U.S. 1, 16–18, 130 S.Ct. 1983, 1994, 176 L.Ed.2d 789 (2010), doubt was cast as to whether the Elisa Pérez–Vera Report should be given great weight as the official commentary of the Convention or whether it is simply a scholarly secondary source. In any event, the Fifth Circuit has consistently used the Elisa Pérez–Vera Report as an authoritative source on the background and meaning of the provisions in the Convention. *See e.g., Larbie v. Larbie,* 690 F.3d 295, 306–07 & n. 12 (5th Cir.2012); *Sealed Appellant v. Sealed Appellee,* 394 F.3d 338, 343 (5th Cir.2004). This Court shall do the same.

tody rights of the non-removing parent under the laws of that country. *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir.2004); Convention, art. 3(a). Furthermore, the non-removing or non-retaining parent must have been exercising those custody rights at the time of removal. *Sealed Appellant*, 394 F.3d at 343; Convention, art. 3(b).

■■■ Thus, proving a case of wrongful removal or retention under the Convention consists of three elements that must be established by a preponderance of the evidence. *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir.2012). "First, the petitioner must show that the respondent removed or retained the child somewhere other than the child's habitual residence." *Larbie*, 690 F.3d at 307. Second, if petitioner is successful in proving the threshold element, then the "question becomes whether the removal or retention violated the petitioner's 'rights of custody' under the habitual-residence nation's laws." *Id.* (citations omitted). And third, if petitioner has rights of custody under the habitual-residence nation's laws, then petitioner need only make a final showing that "at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Id.* (quoting Convention, art. 3(b)).

### i. Habitual Residence

■■■ The threshold question before the Court in this alleged wrongful removal or wrongful retention case is whether Mexico was the habitual residence of G.G. *Id.* at 310 (citing *Mozes v. Mozes*, 239 F.3d 1067, 1072 (9th Cir.2001)); *see also Saldivar v. Rodela*, 879 F.Supp.2d 610, 618–19 (W.D.Tex.2012); *Bernal v. Gonzalez*, 923 F.Supp.2d 907, 916–17 (W.D.Tex.2012). The Convention does not define the term "habitual residence." *Mozes*, 239 F.3d at

1071; *see* Convention, arts. 1–45 (providing no definition for habitual residence). Similarly, ICARA does not provide guidance. *See* 42 U.S.C. § 11602. Thus, courts have created various definitions and competing frameworks for deciding a child's country of habitual residence. *E.g., Compare Mozes*, 239 F.3d at 1076–81 *with Robert v. Tesson*, 507 F.3d 981, 989–95 (6th Cir. 2007). Recently, the Fifth Circuit adopted its framework for making country of habitual residence determinations. *Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir.2012). The inquiry balances the interests of the child with the intentions of the parents. *Larbie*, 690 F.3d at 310. A court's "inquiry into a child's habitual residence is not formulaic; rather it is a fact-intensive determination that necessarily varies with the circumstances of each case." *Id.* (quoting *Whiting v. Krassner*, 391 F.3d 540, 546 (3d Cir.2004)). When determining a child's country of habitual residence, analysis focuses on the "parents' shared intent or settled purpose regarding their child's residence." *Id.* (quoting *Nicolson v. Pappalardo*, 605 F.3d 100, 104 & n. 2 (1st Cir.2010)). The inquiry balances the interest of the child with the parents intentions, but gives greater weight to the parents' subjective intentions when the child is relatively young and incapable of deciding residency. *Id.* (citing *Whiting*, 391 F.3d at 548–49).

■■■ In the instant case, the facts indicate that both parents shared the intent that Puerto Penasco, Sonora, Mexico, was their child's residence prior to Respondent's taking of G.G. to Midland, Texas, with or without Petitioner's consent, in late July of 2012. Petitioner clearly establishes that in 2007, Respondent and Petitioner, together, moved their child G.G. to Puerto Penasco, Sonora, Mexico, from Los Alamos, New Mexico. After relocating to Puerto Penasco, Sonora, Mexico, Respon-

dent lived in Mexico with Petitioner and G.G. for approximately two years. The parents' mutual decision to move their child to Mexico from the United States and relocate to Puerto Penasco, Sonora, Mexico, provides strong evidence of shared parental intent in 2007 to make the Republic of Mexico their child's country of habitual residence. *See Larbie,* 690 F.3d at 310; *Bernal v. Gonzalez,* 923 F.Supp.2d 907, 916–17 (W.D.Tex.2012). Additionally, Respondent moved permanently to Midland, Texas, in 2009, leaving G.G. with Petitioner in Puerto Penasco, Sonora, Mexico. Even though no formal custody agreements exist, the parties arranged visitation. Respondent's mother who resides in Puerto Penasco, Sonora, Mexico, would bring G.G. to Midland, Texas, to visit Respondent during the summer while G.G. was on vacation from school. Petitioner allowed G.G. to go on these trips to visit Respondent and each visit would last approximately one to two months. At the end of each scheduled visit G.G. would be returned to Puerto Penasco, Sonora, Mexico. The parents' decision for G.G. to remain in Puerto Penasco, Sonora, Mexico, with summer visitation in the United States, also provides strong evidence of shared parental intent that the Republic Mexico was G.G.'s country of habitual residence. *See Larbie,* 690 F.3d at 310. Moreover, Respondent concedes in post-trial briefing that the fact "[t]hat Puerto Penasco, Sonora, Mexico was the child's habitual residence prior to the child coming to Midland, Texas ... is not seriously in issue." (Doc. 36 at 4). Although there is strong evidence that the parties had a shared parental intent to make G.G.'s country of habitual residence the Republic of Mexico when they moved to Puerto Penasco, Sonora, Mexico, in 2007, the question remains whether G.G.'s habitual residence was abandoned, thus changing from Puerto Pe-

nasco, Sonora, Mexico, to the United States.

The threshold test for determining whether the parties intended for G.G. to " 'abandon the [habitual residence] left behind' " is whether both parties shared that intention. *Larbie,* 690 F.3d at 310–11 (quoting *Mozes v. Mozes,* 239 F.3d 1067, 1075 (9th Cir.2001) (changes in original)). In this case, whether the parties shared an intent to abandon G.G.'s habitual residence of Mexico is in dispute. (Doc. 36 at 4). "[I]n the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned." *Mozes,* 239 F.3d at 1079. Without shared parental intent the " 'prior habitual residence should be deemed supplanted only where the objective facts point unequivocally to this conclusion.' " *Larbie,* 690 F.3d at 311 (quoting *Mozes,* 239 F.3d at 1082); *see also Rovirosa v. Paetau,* No. H–12–1414, 2012 WL 6087481, at *6 (S.D.Tex. Dec. 6, 2012). In cases such as this in which the parties no longer agree where the child's habitual residence is fixed and "the representations of the parties cannot be accepted at face value ... courts must determine from all available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is." *Mozes,* 239 F.3d at 1076; *see also Van Driessche v. Ohio–Esezeoboh,* 466 F.Supp.2d 828, 841 & n. 19 (S.D.Tex.2006) (adopting the position that courts must consider all available evidence to determine the shared parental intent at the time of removal or retention). Here the Court is presented with two different stories describing the events surrounding G.G.'s removal or retention in the United States and must evaluate the available evidence to determine whether Petitioner agreed to G.G. taking up habitual resi-

dence in the United States. *See Mozes*, 239 F.3d at 1076.

### a. Petitioner's version of events

Petitioner testified that Respondent contacted Petitioner prior to arriving in Puerto Penasco, Sonora, Mexico, on or about July 25, 2012, to arrange visitation with G.G.[4] (Trial Record at 11:01:24–11:01:41). Petitioner agreed to the visitation and allowed G.G. to stay overnight with Respondent at G.G.'s grandparents' home located next door to Petitioner's home. (TR. at 11:03:13–11:03:33 & 11:02:05–11:02:27). Petitioner testified that the visitation was to last approximately two days because that was all the time he had before he needed to return to his work in Midland, Texas.[5] (*Id.* at 11:01:43–11:02:04). Petitioner testified that Respondent took G.G. from Puerto Penasco, Sonora, Mexico to Midland, Texas. (*Id.* at 11:00:27–11:00:49).

Petitioner further testified that she learned that G.G. had been taken by Respondent the very next morning, on or about July 26, 2012, when Petitioner went outside of her home and noticed that Petitioner's truck was gone.[6] (*Id.* at 11:03:33–11:04:00). Petitioner spoke with G.G.'s grandparents and was told that they did not know the whereabouts of G.G. and Respondent. (*Id.* at 11:04:01–11:04:25). Petitioner attempted to contact Respondent via telephone, but Respondent did not answer. (*Id.* at 11:04:26–11:04:44). The next day Petitioner learned from G.G.'s grandparents that Respondent had taken G.G. to Midland, Texas. (*Id.* at 11:04:45–11:05:11). Petitioner testified that she spoke with Respondent on the telephone and that he informed her that he brought G.G. to the United States to get a passport.[7] (*Id.* at 11:07:25–11:08:20). Petition-

---

4. Petitioner's testimony differs from Petitioner's First Amended Verified Petition in which it is stated that "[o]n July 25, 2012 [Respondent] OROZCO came to Puerto Penasco and asked to have a few days visit with G.G." (Doc. 15 ¶ 8 at 3). Additionally, Petitioner's testimony differs from Petitioner's Hague Application which conforms to the allegations made in Petitioner's First Amended Verified Petition. (Ex. P–1 § IV. at 1 "Facts and Circumstances of the Wrongful Removal or Retention"). Respondent impeached Petitioner on cross-examination. (TR. at 11:49:41–11:51:00). Petitioner admitted that her testimony was different, as to those facts, than the facts stated in her First Amended Verified Petition and Hague Application. (*Id.* at 11:58:37–11:59:01).

5. Petitioner testimony differs from Petitioner's First Amended Verified Petition for Return of Child in which it is asserted that Respondent "OROZCO promised to return G.G. on July 30, 2012." (Doc. 15 ¶ 8 at 3). In addition, Petitioner's testimony differs from Petitioner's Hague Application which attests that Respondent "pledged to return me [G.G.] on Monday July 30, 2012." (Ex. P–1 § IV. at 2 "Facts and Circumstances of the Wrongful Removal or Retention"). Respon-

dent impeached Petitioner on cross-examination. (TR. at 11:50:55–11:51:16). Petitioner admitted that her testimony was different, as to those facts, than the facts stated in her First Amended Verified Petition and Hague Application. (*Id.* at 11:58:37–11:59:01).

6. Petitioner's testimony differs from Petitioner's First Amended Verified Petition in which she alleges "[a]t the end of the visit, GALLARDO called OROZCO to arrange to pick up G.G. and OROZCO told her that he was no longer in Mexico, that he had returned to Texas with G.G., and that he was never going to return G.G. to Mexico." (Doc. 15 ¶ 8 at 3–4). In addition, Petitioner's testimony differs from Petitioner's Hague Application and conforms with the allegations made in Petitioner's First Amend Verified Petition. (Ex. P–1 § IV. at 2 "Facts and Circumstances of the Wrongful Removal or Retention"). Respondent highlighted the discrepancy on cross-examination. (TR. at 11:59:05–12:00:57).

7. On cross-examination Respondent highlights that neither Petitioner's First Amended Verified Petition or Petitioner's Application for Return of Child mentions any facts about a passport or return of G.G. after getting G.G. a United States passport. (TR. at 12:00:55–12:02:30)

er further testified that she objected at that time to Respondent taking G.G. to the United States to get a passport. (*Id.* at 11:08:20–11:08:41). Petitioner asked Respondent to bring G.G. back to her in Puerto Penasco, Sonora, Mexico, and he declined. (*Id.* at 11:08:42–11:09:13). Respondent informed Petitioner that he would bring G.G. back after he got her a passport. (*Id.* at 11:10:05–11:10:50). Petitioner testified that she did not agree to this arrangement. (*Id.* at 11:10:51–11:11:07). Respondent informed Petitioner that he would return G.G. in fifteen (15) days because it would take time to get the passport. (*Id.* at 11:11:16–11:11:51). Petitioner testified that she sent text messages to Respondent to make sure G.G. was okay and arrived safely. (*Id.* at 11:11:56–11:11:25).

Petitioner testified that G.G. was to attend school in Mexico for the 2012 to 2013 school year. (*Id.* at 11:00:00–11:00:26). Petitioner further testified that G.G. was scheduled to start school in Puerto Penasco, Sonora, Mexico, at the end of August 2012. (*Id.* at 11:15:07–11:15:26). Petitioner recalled sending text messages to Respondent detailing when G.G.'s school was scheduled to start. (*Id.* at 11:13:53–11:14:20). Petitioner testified that Respondent represented to her that he would bring G.G. back to Mexico before her school started. (*Id.* at 11:14:21–11:14:45). Petitioner asserts that Respondent sent her money to pay for registration and fees associated with G.G.'s school in Mexico. (*Id.* at 11:14:46–11:15:06).

Petitioner testified that she realized that Respondent was not going to bring G.G. back to Mexico on or about August 25, 2012, when he stopped taking her phone calls. (*Id.* at 11:15:27–11:16:09). Petitioner later testified that Respondent told her that he was not going to bring G.G. back to Mexico. (*Id.* at 11:16:10–11:16:25).

Thereafter, on August 30, 2012, Petitioner filed a signed Application for Return of Child under the Hague Convention on the Civil Aspects of International Child Abduction with the Mexican Central Authorities for return of G.G. (*Id.* at 11:17:21–11:19:17).

### b. *Respondent's version of events*

Respondent testified that the parties reached an agreement prior to Respondent arriving in Puerto Penasco, Sonora, Mexico, on July 25, 2012, in which Petitioner consented to Respondent taking G.G. to Midland, Texas, for approximately one to one and a half months for visitation. (*Id.* at 1:43:05–1:43:49). Respondent further testified that prior to arriving in Puerto Penasco, Sonora, Mexico, on July 25, 2012, he asked Petitioner to think about allowing G.G. to stay with him in the United States to attend school and learn English. (*Id.* at 1:43:22–1:43:33). Respondent testified that Petitioner said "she would think about" letting G.G. attend school in the United States, but did not give a definite answer. (*Id.* at 1:43:34–1:43:49). Respondent testified that when he picked G.G. up in Mexico, he was given the child's birth certificate and that Petitioner said they would talk about letting G.G. stay in the United States to attend school when Respondent and G.G. arrived in the United States. (*Id.* at 2:03:22–2:03:49). Respondent denied that the trip was for the sole purpose of getting G.G. a passport, although Respondent admitted the passport was one of things he wanted to take care of while G.G. was in the United States. (*Id.* at 1:54:21–1:54:29 & 1:45:21–1:46:09). Respondent also denied Petitioner's version of events portraying him as being in Puerto Penasco, Sonora, Mexico, to visit G.G. at his parents' home. (*Id.* at 2:02:27–2:02:38).

Respondent testified that while G.G. was in Midland, Texas, Respondent and Petitioner continued to have discussions about enrolling G.G. in school in the United States. (*Id.* at 2:03:18–2:03:34). Respondent testified that he received a text message from Petitioner on July 31, 2012, informing him that G.G.'s school started on August 20, 2012, and that G.G. needed to be back in Mexico by that time. (*Id.* at 1:53:27–1:53:41). Respondent testified that he recalled receiving a text message from Petitioner on August 22, 2012, asking him to bring G.G. back to her in Mexico. (*Id.* at 1:56:52–1:57:03). Respondent testified that when he told Petitioner that he was going to enroll G.G. in school in the United States, Petitioner did not consent and said no. (*Id.* at 1:58:19–1:58:37). Specifically, Respondent testified that "[s]he said she wanted to think about that[,] she wasn't sure[,] that she would let me know . . . . [w]ell, I told her that since she didn't give me a decision I went ahead and enrolled her in school and . . . she just went crazy." (*Id.* at 1:47:30–1:47:48). Respondent testified that he enrolled G.G. in school, two or three days before school started on August 27, 2012. (*Id.* at 2:05:04–2:05:40). Respondent admitted that he enrolled G.G. in school after he received Petitioner's text messages asking for G.G.'s return. (*Id.* at 1:58:36–1:59:18). Respondent further testified that he previously agreed that he would return G.G. to Petitioner if Petitioner wanted G.G. returned and that he decided that he did not want to return G.G. to Mexico. (*Id.* at 2:02:45–2:03:12).

#### c. *Habitual residence determination*

After an exhaustive review of all available evidence the Court determines that Petitioner never agreed to G.G. taking up habitual residence in the United States

and never consented to G.G. being enrolled in school in the United States. There was, therefore, no shared parental intent to shift G.G.'s habitual residence from Mexico to the United States. *See Mozes*, 239 F.3d at 1076; *see also Van Driessche*, 466 F.Supp.2d at 841 & n. 19 (S.D.Tex.2006). The evidence points toward Respondent's retention and subsequent enrollment of G.G. in school in the United States as Respondent's unilateral action. The Court's determination that there was no change in G.G.'s habitual residence is based upon the parties' testimony and analysis of the evidence presented in light of the parties divergent testimony.

#### *Testimony, school enrollment, and text messages*

Testimony of the parties reveals two different versions surrounding how G.G. arrived in Midland, Texas. Petitioner asserts that she never consented to Respondent taking G.G. to Midland, Texas, and Respondent asserts that Petitioner consented to a visit to Midland, Texas, with the possibility of G.G. staying indefinitely to attend school in Midland, Texas. *See supra* at 12–16. Although Respondent raises doubt as to the credibility of Petitioner's testimony by highlighting inconsistencies in her testimony, her First Amended Verified Petition, and her Application for Return of Child under the Hague Convention,[8] Petitioner remains consistent in her assertion that G.G. was removed by Respondent to Midland, Texas, without her consent. *Assuming arguendo* that Respondent's version of the facts are correct and that Petitioner consented to G.G. traveling to Midland, Texas, with the possibility of attending school in the United States, Respondent's own testimony and the parties' text messages reveal that Petitioner never agreed to allow G.G. to stay in

8. *See Supra* at 12–13 n. 4, n. 5, n. 6, & n. 7.

the United States to attend school in Midland, Texas. *See supra* at 14–16.

G.G. attended school in Puerto Penasco, Sonoroa, Mexico, from 2009 until 2012, and was enrolled in a school in Mexico for the 2012–2013 school year. (Doc. 35 at 6; Ex. P–2). G.G. was scheduled to start school in Mexico on or about August 20, 2012. (Ex. P–5; Ex. R–9c). On July 31, 2012, Petitioner sent, and Respondent received, the following text message: "Luis [Respondent] the girl starts on august 20 and her teacher told me she has to be there on that day because they're giving her the books and notebooks hopefully you can bring her back by that day[.]" (Ex. P–5; Ex. R–9c). On August 22, 2012, Petitioner sent, and Respondent received, two additional text messages that demanded the return of G.G. The text messages read "[b]ring me the girl please" and "I don't want to talk I just want you to bring my girl back[.]" (Ex. P–5; Ex. R–9d). Thereafter, on or about August 25, 2012, Respondent enrolled G.G. in a school in Midland, Texas, which clearly followed Petitioner's demand for return and objections to G.G. being enrolled in school in the United States. Respondent, in his own testimony, admits that he had agreed to return G.G. to Petitioner if Petitioner wanted G.G. returned to Mexico and not enrolled in school in Midland, Texas. Respondent's actions clearly violate the arrangement that he testified to entering into with Petitioner. The aforementioned provides strong evidence that under Respondent's version of the facts it was Petitioner's intent for G.G. to be returned to Puerto Penasco, Sonora, Mexico, to attend the 2012–2013 school year.

Moreover, based upon the available evidence and under Respondent's version of events, Petitioner did not agree to G.G. taking up habitual residence in the United States, and Petitioner expected compliance with the parties' agreement (alleged to exist by Respondent) that G.G. would be returned to Mexico before G.G.'s school started for the school year. *See Mozes v. Mozes*, 239 F.3d 1067, 1076 (9th Cir.2001). The available evidence indicates that under Respondent's version of the facts G.G.'s translocation from her established habitual residence of Mexico to the United States was "intended to be of a specific, delineated period" to end when Petitioner determined whether she would consent to G.G. attending school in Midland, Texas. *See Mozes*, 239 F.3d at 1077. Thus, under Respondent's own version of the facts the parties had a shared intent to return G.G. to her country of habitual residence and Respondent's unilateral attempt to change G.G.'s country of habitual residence from Mexico to the United States must be denied. *See Larbie v. Larbie*, 690 F.3d 295, 311 (5th Cir.2012). The objective facts clearly point to not supplanting G.G.'s prior habitual residence—the Republic of Mexico. *Larbie*, 690 F.3d at 311 (citing *Mozes*, 239 F.3d at 1082).

Based on the aforementioned, Petitioner satisfies the threshold requirement for cases arising under the Convention by establishing that the child's country of habitual residence prior to removal or retention was the Republic of Mexico. *See Mozes*, 239 F.3d at 1072. Furthermore, Petitioner has proven by a preponderance of the evidence that Respondent removed or retained G.G. in the United States, "somewhere other than the child's habitual residence." *Larbie*, 690 F.3d at 307.

### ii. Rights of Custody

 Since Petitioner Gallardo successfully proved that Mexico was the child's country of habitual residence, the "question becomes whether the removal or retention violated the petitioner's 'rights of custody' under the habitual-residence na-

tion's laws." *Id.; Sealed Appellant v. Sealed Appellee,* 394 F.3d 338, 343 (5th Cir.2004). "The Convention defines 'rights of custody' to 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" *Abbott v. Abbott,* 560 U.S. 1, 9, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010) (quoting Convention, art. 5(a)). Rights of custody arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Convention, art. 3. Further, breach of rights of custody are determined by the law of the State in which the child was an habitual resident immediately before removal or retention. *Id.*

In the matter before the Court, rights of custody will be determined by the application of the laws of the Republic of Mexico.[9] The State of Sonora, Mexico, in accordance with the Sonora Civil Code adheres to the legal doctrine of *patria potestad. See* Son. Civ.Code, tit. 8, ch. 1, art. 578 *et seq.;* (Ex. P–4). "Pursuant to that doctrine both parents have joint custody rights." *Castro v. Martinez,* 872 F.Supp.2d 546, 555 (W.D.Tex.2012) (finding that *patria potestad* satisfied rights of custody in a case arising from Chihuahua, Mexico); *Saldivar v. Rodela,* 879 F.Supp.2d 610, 623–27 (W.D.Tex.2012) (providing a comprehensive discussion on *patria potestad* and the rights attributable to parents under the legal doctrine); *see also Munoz v. Ramirez,* 923 F.Supp.2d 931, 949–52

(W.D.Tex.2013); *Bernal v. Gonzalez,* 923 F.Supp.2d 907, 917–19 (W.D.Tex.2012).

Article 579 of the Sonora Civil Code details how an unemancipated minor child such as G.G. is under *patria potestad* (parental authority) as long as a relative can exercise parental authority over the child in accordance with the law. Son. Civ.Code, art. 579 ("Non-emancipated minor children are under parental authority/responsibility (*patria potestas*) as long as the ancestors that must exert it according to the Law subsist."); (Ex. P–4). Article 581 explains that *patria potestas* over the child of a married couple shall be exercised by both the father and the mother. Son. Civ.Code, art. 581; (Ex. P–4). Further, article 588 provides, "[a]s long as the child is under parental authority/responsibility (*patria potestas*), he or she shall not leave the house of those who exert it without their permission or by means of an order emitted by an authority legally qualified to do so." Son. Civ.Code, art. 588; (Ex. P–4).

Here, Petitioner has been exercising *patria potestad* over G.G. since Respondent and Petitioner originally moved G.G. to Puerto Penasco, Sonora, Mexico, in 2007. *See* Son. Civ.Code, art. 581. Moreover, Respondent concedes in post-trial briefing that the fact that Petitioner "GALLARDO (as well as [Respondent] OROZCO) had rights of custody in the child as parents ... is not seriously in issue." (Doc. 36 at 4).

Based on the aforementioned, this Court finds that Petitioner has rights of custody

9. Petitioner requested that judicial notice be taken of Mexican law. (Doc. 24). The Court took judicial notice of the relevant foreign law of Mexico under the Civil Code for the State of Sonora, Mexico, as permitted by Article 14 of the Convention. Judicial notice of foreign law is appropriate in cases arising under the Convention. Convention, art. 14 (providing that "[i]n ascertaining whether there has been

a wrongful removal ... the judicial ... authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.").

conveyed by *patria potestad* under the laws of the State of Sonora, Mexico. *See Castro*, 872 F.Supp.2d at 555; *Saldivar*, 879 F.Supp.2d at 623–27; *see also Munoz*, 923 F.Supp.2d at 949–52; *Bernal*, 923 F.Supp.2d at 917–19. Furthermore, *patria potestad* gave Petitioner specific rights of custody as defined by the Convention. *See Abbott v. Abbott*, 560 U.S. 1, 8–9, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010); Convention, art. 5(a). Petitioner has proven by a preponderance of the evidence that Respondent removed or retained G.G. in breach of Petitioner's rights of custody under the laws of the child's habitual residence—the Republic of Mexico.

### iii. Rights of custody exercised at the time of removal or retention

Petitioner's final hurdle to making a prima facie case for wrongful removal or retention of G.G. is showing that at the time of removal or retention she was actually exercising her rights of custody or would have been exercising those rights but for the removal or retention. *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir.2012); Convention art. 3(b). Courts apply a liberal approach when determining whether rights of custody were actually being exercised. *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344–345 (5th Cir.2004) (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1065–66 (6th Cir. 1996)). This approach avoids deciding merits of a custody dispute, thus, conforming with the objectives of the Convention. *Friedrich*, 78 F.3d at 1065; 42 U.S.C. § 11601(b)(4) (limiting the scope of U.S. Courts to determining "rights under the Convention and not the merits of any underlying child custody claims."). "To show failure to exercise custody rights, the removing [or retaining] parent must show the other parent has abandoned the child." *Sealed Appellant*, 394 F.3d at 344–345.

In the instant case, Respondent made no showing that Petitioner abandoned her child. In contrast, Petitioner clearly established that she was exercising her rights of custody under *patria potestad.* Furthermore, the testimony revealed that Petitioner consented to allow G.G. overnight visitation with Respondent in Mexico at his parents' home that was to end a few days after July 25, 2012, or in the alternative, Petitioner consented to G.G. traveling with Respondent to the United States for summer visitation with an agreement that G.G. was to be returned to Puerto Penasco, Sonora, Mexico, if the parties did not mutually agree to allow G.G. to stay and attend school in Midland, Texas. No such mutual agreement occurred and Respondent unilaterally enrolled G.G. in school in Midland, Texas, over Petitioner's objection. Moreover, Respondent concedes in post-trial briefing that it "is not seriously in issue" whether Petitioner "GALLARDO (as well as [Respondent] OROZCO) had rights of custody in the child as parents which she [Petitioner] was at least minimally exercising at the time . . . ." (Doc. 36 at 4).

No abandonment of the child occurred and Petitioner would have been exercising her rights of custody but for the wrongful removal or retention; therefore, Petitioner has established all three elements necessary to make a prima facie case for return of G.G. to the Republic of Mexico under the Convention. *See Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir.2012).

### C. Respondent Orozco's case

"When a child under the age of sixteen has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Abbott v. Abbott*, 560 U.S. 1, 9, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789

(2010) (quoting Convention, art. 12). The Convention sets forth five narrow affirmative defenses to return of a child wrongfully removed or retained from the country of habitual residence. 42 U.S.C. § 11603(e)(2)(A, B); Convention, arts. 12, 13, 13(a), 13(b), 20. Two of the defenses must be proven by clear and convincing evidence, 42 U.S.C. § 11603(e)(2)(A): the grave risk of physical or psychological harm defense, Convention, art. 13(b); and, when return would violate the "fundamental principles" relating to the "protection of human rights and fundamental freedoms" of the returning country, Convention, art. 20. The remaining three defenses must be proven by a preponderance of the evidence, 42 U.S.C. § 11603(e)(2)(B): when judicial proceedings were commenced one year after the date of retention and the respondent proves that the child is now settled into the new environment, Convention, art. 12; when the child objects to return and the court finds that the child has reached an age and level of maturity appropriate for the court to take into account the child's view, Convention, art. 13; and, when the petitioner seeking return of the child had consented to or subsequently acquiesced to the removal or retention, Convention, art. 13(a). Respondent asserts three of the five affirmative defenses.

### i. Grave risk of physical or psychological harm

■ Respondent Orozco pleaded the grave risk affirmative defense under the Convention in his Original Answer. (Doc. 12 ¶ 26 at 3). Respondent specifically alleged that he "opposes the return of the child under Article 13(b) of the Convention because there is a grave risk that the return of the child would expose her to physical or psychological harm or otherwise place the child in an intolerable situation." (*Id.*). A respondent who opposes

the return of a child and asserts the "grave risk" affirmative defense has the burden of establishing by clear and convincing evidence "that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." 42 U.S.C. § 11603(e)(2)(A); Convention, art. 13(b). Even if a respondent establishes the grave risk exception, "a federal court has 'and should use when appropriate' the discretion to return a child to his or her place of habitual residence 'if return would further the aims of the Convention.'" *England v. England*, 234 F.3d 268, 271–72 (2000) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir.1996)); *see also* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed.Reg. 10503–10516, 10509 (March 26, 1986) (hereinafter "Convention Analysis") ("[A] finding that one or more of the exceptions provided by Article[s] 13 and 20 are applicable does not make refusal of a return order mandatory.... [C]ourts retain the discretion to order the child returned even if they consider that one or more of the exceptions applies.").

■ A high threshold exists for establishing the grave risk of harm defense. *See e.g., Silverman v. Silverman*, 338 F.3d 886, 900–01 (8th Cir.2003); *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996). The respondent opposing the child's return must demonstrate "that the risk to the child is grave, not merely serious." Convention Analysis, 51 Fed.Reg. 10503–10516, 10510 (March 26, 1986). A grave risk of harm can be established when return of the child to the country of habitual residence puts the child in "immediate danger prior to resolution" of the underlying custody dispute. *Friedrich*, 78 F.3d at 1069. Examples of such immediate danger include "returning the child to

a zone of war, famine, or disease." *Id.;* *Sanchez v. Sanchez,* No. SA–12–CA–568, 2012 WL 5373461, at *10–11 (W.D.Tex. Oct. 30, 2012).

 In support of his "grave risk" affirmative defense, Respondent elicited testimony from Petitioner admitting that she works late hours at a casino. In addition, Respondent questioned whether Petitioner works, or had worked in the past, as a prostitute. Petitioner denied the allegations of prostitution and no other evidence of such activities was placed before the Court. Respondent's argument that return of G.G. to the child's country of habitual residence, the Republic of Mexico, would pose a grave risk of harm to G.G. because of Petitioner's work at a casino and unsupported allegations of prostitution fall extremely short of reaching the high threshold necessary to establish the grave risk of harm affirmative defense. *See Friedrich,* 78 F.3d at 1069; 42 U.S.C. § 11603(e)(2)(A); Convention, art. 13(b).

 In order to establish the "grave risk" affirmative defense, Respondent must show by clear and convincing evidence "that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." 42 U.S.C. § 11603(e)(2)(A); Convention, art. 13(b). Based on the evidence presented, Respondent did not meet the burden of proof to prove that G.G. would face a "grave risk" of harm by being placed in an intolerable situation upon return to the Republic of Mexico. *Id.* Furthermore, the grave risk of harm defense was not intended to be used by a respondent as a vehicle to litigate the child's best interests. Convention Analysis, 51 Fed. Reg. 10503–10516, 10510 (March 26, 1986). Without a showing of "grave risk" by clear and convincing evidence, Petitioner's claims are more appropriate for a Mexican court as U.S. courts are limited to deciding "rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4). Any debate regarding whether Respondent is more fit to be the primary caretaker of G.G. based on Petitioner's work must take place in the Republic of Mexico. *See* Elisa Pérez–Vera Explanatory Report ¶ 19 at 430. Therefore, Respondent has failed to establish by clear and convincing evidence that return of the child would pose a grave risk of physical or psychological harm or an intolerable situation under the Convention. *See* 42 U.S.C. § 11603(e)(2)(A); Convention, art. 13(b).

### ii. Consent to or subsequent acquiescence to removal or retention

Respondent pleaded, and argued at trial, that Petitioner consented or subsequently acquiesced to Respondent removing G.G. from Puerto Penasco, Sonora, Mexico, to Midland, Texas. (Doc. 12 ¶ 25 at 3). Return of a child may be successfully opposed if a respondent establishes by a preponderance of the evidence that the person "exercising the custody rights at the time of removal or retention ... had consented to or subsequently acquiesced in the removal or retention." 42 U.S.C. § 11603(e)(2)(B); Convention, art. 13(a).

 "The consent defense involves the petitioner's conduct prior to the contested removal or retention...." *Larbie v. Larbie,* 690 F.3d 295, 308 (5th Cir.2012) (quoting *Baxter v. Baxter,* 423 F.3d 363, 371 (3d Cir.2005); *see also Saldivar v. Rodela,* 879 F.Supp.2d 610, 627 (W.D.Tex. 2012)). When examining a consent defense, a court considers what the petitioner actually agreed to when allowing the child to travel outside of its country of residence and the scope of the petitioner's consent. *Larbie,* 690 F.3d at 309 (citing *Baxter,* 423 F.3d at 371); *see also Munoz v. Ramirez,*

No. Mo:12–CV–00082, 2013 WL 563419, at *16 (W.D.Tex. Jan. 25, 2013).

In contrast, the "acquiescence [defense] addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Id.* at 308 (quoting *Baxter*, 423 F.3d at 371) (changes to original); *see also Gonzalez–Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir.2001). When examining an acquiescence defense, " 'each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights.' " *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir.2007) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir.1996)). Furthermore, the defense of acquiescence has been held to require "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070; *see also Velasquez v. Green*, No. 4:12–CV–66, 2012 WL 2885662, at *5 (E.D.Tex. July 13, 2012); *De Vasconcelos v. De Paula Batista*, No. 4:10–CV–00628, 2011 WL 806096, at *7 (E.D.Tex. March 1, 2011).

Respondent asserts that Petitioner consented to Respondent's removal of G.G. from Puerto Penasco, Sonora, Mexico, to Midland, Texas. Petitioner asserts that she never consented to the removal of G.G. and that Respondent took G.G. without her consent. The Court's discussion *supra* at 12–18, finding that G.G.'s habitual residence never shifted from the Republic of Mexico to the United States fully highlights the discrepancies between the parties' testimony. As previously mentioned, Respondent points out differences in Petitioner's testimony, her First Amended Verified Petition, and her Application for Return under the Hague. *See supra* at 16. Although Petitioner remains consistent

with her assertion that G.G. was taken without her consent, Respondent's impeachment of Petitioner at trial attacks her credibility. However, *assuming arguendo* that Petitioner's version of the event is false and she consented to Respondent taking G.G. from Puerto Penasco, Sonora, Mexico, to Midland, Texas, Respondent's affirmative defense of consent fails on his own testimony.

Respondent testified that Petitioner consented to Respondent taking G.G. to Midland, Texas, for summer visitation with the possibility of G.G. staying in Midland, Texas, to attend school, if the parties reached an agreement to enroll G.G. in school in the United States. Respondent admitted that Petitioner did not agree to him enrolling G.G. in school in Midland, Texas, but he went ahead and enrolled her in school following three text messages indicating that Petitioner wanted G.G. returned. Respondent further testified that he agreed to return G.G. to Petitioner in Puerto Penasco, Sonora, Mexico, if Petitioner did not want G.G. enrolled in school. Respondent's own testimony defines the scope of Petitioner's consent. *See Larbie*, 690 F.3d at 308–09 (citing *Baxter*, 423 F.3d at 371). Even assuming that Petitioner consented to Respondent taking G.G. to Midland, Texas, Petitioner's scope of consent was limited to allowing G.G. to travel outside of the child's country of habitual residence, the Republic of Mexico, for summer visitation with the possibility of remaining in Midland, Texas, to attend school, if the parties agreed to such an arrangement. Respondent's testimony and the text messages between the parties clearly lead to the conclusion that Petitioner never agreed to G.G.'s enrollment in school in Midland, Texas, and asked for the return of G.G. Thus, Respondent's removal was outside of the scope of Petitioner's consent. *See id.*

Similar to his other arguments, Respondent's argument that Petitioner acquiesced to the removal or retention of G.G. in the United States also falls short. There is no evidence before the Court that Petitioner subsequently acquiesced to G.G.'s removal or retention in the United States. *See id.* at 308 (citing *Baxter,* 423 F.3d at 371). To the contrary, the text messages entered into evidence show that on July 31, 2012, Petitioner informed Respondent when G.G.'s school was scheduled to begin in Mexico and when she needed to be returned. (Ex. P–5; Ex. R–9c) ("Luis [Respondent] the girl starts on august 20 and her teacher told me she has to be there on that day because they're giving her the books and notebooks hopefully you can bring her back by that day"). The text messages also provide the Court with evidence that on August 22, 2012, Petitioner demanded the return of G.G. (Ex. P–5; Ex. R–9d) ("Bring me the girl please" and "I don't want to talk I just want you to bring my girl back"). Thereafter, on August 30, 2012, Petitioner filed her Application for Return of Child under the Hague Convention on the Civil Aspects of International Child Abduction with the Mexican Central Authorities. (Ex. P–1). Petitioner's actions reveal a speedy attempt and diligent effort to regain G.G. and do not lead the Court to believe that Petitioner acquiesced. Moreover, Respondent has presented no evidence that Petitioner ever made a statement or committed an act with the required formality to acquiesce; ever made a written renunciation of her rights of custody; or ever exhibited a consistent attitude of acquiescence to G.G.'s wrongful removal or retention in the United States. *See Friedrich,* 78 F.3d at 1070. Therefore, Respondent has failed to establish by a preponderance of the evidence that Petitioner "had consented to or subsequently acquiesced in the removal or re-tention" of G.G. *See* 42 U.S.C. § 11603(e)(2)(B); Convention, art. 13(a).

### iii. *Age and maturity exception to return*

■ Respondent pleaded, and asserts in post-trial briefing, that G.G. objects to being returned, and therefore she should not be returned to Petitioner in Puerto Penasco, Sonora, Mexico. (Docs. 12 ¶ 27 at 3 & 36 at 1). The Convention provides that the "judicial ... authority may ... refuse the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Convention, art. 13. The respondent "opposing the child's return must establish the child's maturity by a preponderance of the evidence." *England v. England,* 234 F.3d 268, 272 (5th Cir.2000).

■ The undersigned met *in camera* with G.G., who recently turned 8 years old. The Fifth Circuit has previously held that a 13 year-old child did not meet the degree of maturity required to object and determine where he/she wanted to live. *England,* 234 F.3d at 272 (reversing the district court's decision that the child met the age and maturity requirement); *see also Dietz v. Dietz,* 349 Fed.Appx. 930, 933–34 (5th Cir.2009) (not selected for publication) (the district court was not clearly erroneous in finding that a nine year-old and a 13 year-old did not qualify for the exception). "[W]hether a child is of sufficient age and maturity is a fact-intensive process, and we decline[ ] to hold, as a matter of law, that any particular age is sufficient to meet the defense." *Dietz,* Fed.Appx. at 934 (citing *England,* 234 F.3d at 272 n. 4). G.G. is a precious and alert child; however, in this Court's opinion, she is not of sufficient age and maturity for the Court to take into account her

objection to being returned to Mexico. Petitioner has failed to establish by a preponderance of the evidence that G.G. "objects to being returned and has attained an age and degree of maturity" in which it would be appropriate for this Court to take account of G.G.'s views while making a return decision. *See* 42 U.S.C. § 11603(e)(2)(B); Convention, art. 13.

### D. Attorney Fees and Costs

▮ Petitioner Gallardo has requested attorney fees and costs, including transportation expenses pursuant to Article 26 of the Convention and 42 U.S.C. § 11607(b). Petitioner Gallardo has not, to date, submitted proof of costs for transportation, expenses, or legal fees. In a case arising under the Convention, ICARA requires that "[a]ny court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster homes or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate." 42 U.S.C. § 11607(b)(3). It is the respondent's burden to show that an award of attorney fees, expenses, and costs would be "clearly inappropriate." *Saldivar v. Rodela,* 879 F.Supp.2d 610, 632 (W.D.Tex.2012) (quoting *Whallon v. Lynn,* 356 F.3d 138, 140 (1st Cir.2004); *see also Saldivar v. Rodela,* 894 F.Supp.2d 916 (W.D.Tex.2012) (providing detailed analysis of an award of attorney fees and costs in a case arising under the Convention)).

### III. CONCLUSIONS OF LAW

The Republic of Mexico was the country of habitual residence for G.G. prior to her wrongful removal on or about July 26, 2012, or retention on or about August 20, 2012.

In accordance with Article 3 of the Convention and the International Child Abduction Remedies Act, Petitioner proved by a preponderance of the evidence that G.G. was wrongfully removed or retained from her country of habitual residence. Petitioner had rights of custody under the laws of the Republic of Mexico, specifically under the laws of Sonora, Mexico, the State in which the child was an habitual resident immediately before removal or retention, and Petitioner was exercising those rights before removal or retention. Respondent's removal or retention of G.G. breached Petitioner's rights of custody.

Respondent failed to prove that G.G.'s habitual residence changed from the Republic of Mexico to the United States prior to her being wrongfully removed or retained in the United States. Petitioner and Respondent did not have a shared intent to change G.G.'s habitual residence from the Republic of Mexico to the United States.

In accordance with Article 13 of the Convention and the International Child Abduction Remedies Act, Respondent failed to establish by clear and convincing evidence that there is a grave risk that return of G.G. would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

In accordance with Article 13 of the Convention and the International Child Abduction Remedies Act, Respondent failed to establish by a preponderance of the evidence that Petitioner consented to or subsequently acquiesced to G.G.'s removal or retention.

In accordance with Article 13 of the Convention and the International Child

Abduction Remedies Act, Respondent failed to establish by a preponderance of the evidence that G.G. "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [the child's] views."

A primary objective of the Convention is to ensure that rights of custody established in one country are respected by the country where the child has been taken. Convention, art. 1. This Court finds that Petitioner Gallardo had rights of custody under the laws of the child's country of habitual residence—the Republic of Mexico. Respondent unilaterally removed or retained G.G. in the United States without Petitioner's consent or acquiescence, thus breaching her rights of custody under the laws of the Republic of Mexico. Petitioner was exercising rights of custody before the removal or retention, so the removal or retention of the child was wrongful and return is the appropriate remedy. The Court further finds that no affirmative defenses were proven to halt the return of the child.

All parties agree that this is a difficult case. Respondent had rational reasons for removing or retaining his child in the United States; however, this Court is limited to deciding rights under the Convention and not the merits of the underlying child custody claim. *See* 42 U.S.C § 11601(b)(4). Courts do not apply the best interests of the child standard when determining whether return of children to their country of habitual residence is appropriate. Nothing decided in these proceedings prejudices Respondent Orozco's ability to file suit in the Republic of Mexico for custody of G.G. The Convention and ICARA attempt to "deter parents from crossing borders in search of a more sympathetic court." *England v. England,* 234 F.3d 268, 271 (5th Cir.2000) (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1067

(6th Cir.1996)). It is the aim of the Convention to "leave custodial decisions to the courts of the country of habitual residence." *Abbott v. Abbott,* 560 U.S. 1, 9, 130 S.Ct. 1983, 1989, 176 L.Ed.2d 789 (2010); Convention, art. 19.

### JUDGMENT

Based on the aforementioned, this Court finds that G.G.'s habitual residence is the Republic of Mexico and that the child was wrongfully removed or retained in the United States in violation of the Convention. Petitioner Maria Julia Gallardo's Verified Petition for Return of Child is **GRANTED.**

**IT IS HEREBY ORDERED** that G.G. shall be immediately returned to the custody of Petitioner Gallardo. If Respondent does not return G.G. to Petitioner Gallardo within fourteen (14) days of this Order, Petitioner is **ORDERED** to file a Motion to Enforce Judgment and Application for Clerk to Issue Writ of Attachment in which Petitioner shall detail how G.G. shall be returned.

**IT IS HEREBY ORDERED** that Respondent Orozco pay all necessary expenses and attorney fees pursuant to 42 U.S.C. § 11607(b)(3). The award of attorney fees and costs under 42 U.S.C § 11607(b)(3) is contingent upon Petitioner filing, within fourteen (14) days of this Order, an itemization of all costs requested and a brief detailing the services rendered. FED.R.CIV.P. 54(d)(2)(B)(i). Respondent Orozco shall have seven (7) days from date of service of Petitioner's itemization and brief to file a brief in response, asserting why the requested award is "clearly inappropriate." *See* 42 U.S.C. § 11607(b)(3). Based on the aforementioned, this Court will determine the appropriate monetary award of attorney fees and costs.

**IT IS FURTHER ORDERED** that the Court retains jurisdiction over this case to

permit any modification or enforcement of the Order.

It is so **ORDERED.**